**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

THE UNITED STATES OF AMERICA

        v.                                 No. 1:21-cr-41-JL-01

ARIA DIMEZZO

<u>MOTION TO DISMISS COUNTS ONE AND THREE</u>

The accused, Aria DiMezzo, through counsel, respectfully moves to dismiss Counts One and Three of the superseding indictment.

DiMezzo is charged in nine counts of the indictment. Seven of those counts accuse of her fraud. She did not defraud anyone and is innocent of those seven counts. She will fight those out at trial. The other two counts relate to DiMezzo's operation of a business which exchanged virtual currency, such as Bitcoin, for U.S. Dollars. The Government claims DiMezzo broke the law because she did not register that business with FinCEN, a federal agency. The Government's claim fails because, during the timeframe in the indictment, FinCEN had no authority to require registration of a business which exchanges virtual currency for dollars.

The federal statute which requires registration of "money transmitting businesses" has been amended several times. The version which applies to this case is the version in effect from 2001 to 2021. That statute defined a money transmitting business as one engaged in the transmission or exchange of "funds." The federal agency charged with administering this law, FinCEN, decided, on its own, without authority from Congress, that the authority to regulate funds also gave it the authority to regulate virtual currency. That decision was wrong.

The law that applies in this case did not authorize federal agency regulation of those engaged in the transmission or exchange of virtual currency. Virtual currency, which is now a multi-trillion-dollar part of the economy, did not even exist at the time the statute was passed. Since the invention of virtual currency, federal agencies have disputed whether it is property, a security, a commodity, money, or something else. To this day, they are fighting over the issue. Lastly, and most importantly, we know from the Supreme Court's major questions doctrine that regulatory agencies cannot presume from a word or two in a statute to have the authority to regulate vast and important sectors of the American economy. FinCEN was not entitled to presume that one word in a 2001 statute predicted the invention of virtual currency in 2008 and delegated to a federal agency full authority to regulate what has become a trillion-dollar sector of the American economy. Our Constitution says such decisions belong to the elected representatives of the People – Congress – and any delegation of such authority must be explicitly conveyed.

Therefore, as detailed below, the court must dismiss Counts One and Three.

The Superseding Indictment Charges that DiMezzo Conspired to and Did Operate an Unregistered Money Transmitting Business, Which, According to the Government, Congress Required to Be Registered with the Department of the Treasury.

Ms. DiMezzo is charged in nine counts of a 33-count superseding indictment. Doc. 139. The charges against her are Conspiracy to Operate Unlicensed Money Transmitting Business [18 U.S.C. §§ 371, 1960(a) and (b)(1)(B)], Operation of Unlicensed Money Transmitting Business [18 U.S.C. §§ 1960(a) and (b)(1)(B)], four counts of Wire Fraud [18 U.S.C. § 1343], and three counts of Money Laundering [18 U.S.C. § 1957]. The charges that are relevant to this motion are Counts One and Three,

which allege that businesses which exchange virtual currency, such as Bitcoin, for fiat

currency, such as U.S. Dollars, were required, prior to 2021, to register as a "money

transmitting business" under federal law.

Count One charges that from January 2016 to March 15, 2021, Aria DiMezzo

conspired with Ian Freeman and others to operate an unlicensed "money transmitting

business," in violation of 18 U.S.C. §§ 1960(a) and 1960(b)(1)(b). Specifically, the

indictment alleges that DiMezzo and Freeman conspired to operate "a virtual currency

exchange business, that involved the transportation or transmission of funds which failed

to comply with the money transmitting business registration requirements set forth in

Title 31, United States Code, Section 5330, and the regulations prescribed thereunder."

The alleged factual basis for this charge is that between May 2016 and March 15, 2021,

DiMezzo and Freeman opened and operated accounts at financial institutions to sell

virtual currency, that DiMezzo and Freeman met customers on Localbitcoins.com and

sold them Bitcoin in exchange for fiat currency, that Freeman operated virtual currency

kiosks, that DiMezzo and Freeman instructed customers to falsely describe their deposits

as "church donations," and that this conduct was the object of an agreement between

Freeman and DiMezzo.

Count Three charges that from an unknown date, but at least by September 2019,

and continuing until March 15, 2021, DiMezzo violated 18 U.S.C. § 1960(a) and §

1960(b)(1)(b), in that she "knowingly conducted, controlled, managed, supervised,

directed, and owned an unlicensed money transmitting business affecting interstate and

foreign commerce, namely a virtual currency business, that involved the transportation or

transmission of funds which failed to comply with the money transmitting business

3

registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder." The factual basis for this charge is the allegation that Aria DiMezzo advertised virtual currency for sale online through websites, including LocalBitcoins.com, and that she that she met customers on Localbitcoins.com and sold them Bitcoin in exchange for fiat currency.

Thus, both Counts One and Three depend on the validity of the claim that in 31 U.S.C. § 5330, as written at the time of the alleged conduct, Congress authorized the Department of the Treasury to require registration of businesses engaged in the exchange of virtual currency for fiat currency. As explained below, Congress did not authorize such regulation.

<u>The 2001 USA PATRIOT Act Version of 31 U.S.C. § 5330, Not the Current Version, Applies to this Case.</u>

Eighteen U.S.C. § 1960(b)(1)(B) prohibits the operation of a money transmitting business which "fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." Thirty-one U.S.C. § 5330 requires the "registration" of "money transmitting businesses" with the Secretary of the Treasury. "FinCEN," the Financial Crimes Enforcement Network, a bureau of the Department of the Treasury, has implemented what it believes are the registration requirements under these statutes. *See generally*, Registration of money service businesses, 31 C.F.R. § 1022.380 and https://www.fincen.gov.

The definition of a "money transmitting business" has changed over time. The very first version of § 5330, enacted in 1994, defined a "money transmitting business"

very simply. The 1994 definition in 31 U.S.C. § 5330(d)(1)(A) provided that a money

transmitting business is:

> [Any business which] provides check cashing, currency exchange, or money
> transmitting or remittance services, or issues or redeems money orders, travelers'
> checks, and other similar instruments…

*See* Riegle Community Development and Regulatory Improvement Act Of 1994, Pub. L.

No. 103-325, 108 Stat. 2160, 2247-48 (1994).

In 2001, 31 U.S.C. § 5330(d)(1)(A) was amended by the USA PATRIOT Act to

provide that "money transmitting business" means any business which,

> …provides check cashing, currency exchange, or money transmitting or
> remittance services, or issues or redeems money orders, travelers' checks, and
> other similar instruments or any other person who engages as a business in the
> transmission of funds, including any person who engages as a business in an
> informal money transfer system or any network of people who engage as a
> business in facilitating the transfer of money domestically or internationally
> outside of the conventional financial institutions system;

Uniting and Strengthening America by Providing Appropriate Tools Required to

Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act Of 2001, Pub. L. No. 107-

56, 115 Stat. 272, 328 (2001).

The 2001 definition of a "money transmitting business" was in effect for nearly

20 years, until January 1, 2021. In Public Law 116-283, effective January 1, 2021,

Congress specifically addressed for the first time whether "virtual currencies" should be

within the scope of the registration requirement of 31 U.S.C. § 5330. Congress found that

"the mission of FinCEN should be to continue to safeguard the financial system from

illicit activity, counter money laundering and the financing of terrorism, and promote

national security through strategic use of financial authorities and the collection, analysis,

and dissemination of financial intelligence" and that "although the use and trading of

virtual currencies are legal practices, some terrorists and criminals, including

transnational criminal organizations, seek to exploit vulnerabilities in the global financial

system and increasingly rely on substitutes for currency, including emerging payment

methods (such as virtual currencies), to move illicit funds." William M. (Mac)

Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-

283, 134 Stat. 3388, 4552 (2021). Based on this finding, Congress added language to

include money transmitting businesses which dealt in virtual currency. Pub. L. No. 116–

283, § 6102(d)(2)(A), substituted the words "currency, funds, or value that substitutes for

currency," for "funds," so that the statute now reads:

> (1) Money transmitting business. The term "money transmitting business" means
> any business other than the United States Postal Service which—
>
> (A) provides check cashing, currency exchange, or money transmitting or
> remittance services, or issues or redeems money orders, travelers' checks, and
> other similar instruments or any other person who engages as a business in the
> transmission of currency, funds, <u>or value that substitutes for currency</u>,
> including any person who engages as a business in an informal money transfer
> system or any network of people who engage as a business in facilitating the
> transfer of money domestically or internationally outside of the conventional
> financial institutions system;

31 U.S.C. § 5330(d)(1)(A) (emphasis added). The emphasized language in this version

which became effective in 2021 - "or value that substitutes for currency" – was not in any

prior version of the statute.

The current version of the statute, and its "value that substitutes for currency"

language, does not apply to this case. Rather, the prior version, enacted in 2001, governs

this case. The applicable time period for Counts One and Three is January of 2016 to

March 15 of 2021. The current version of 31 U.S.C. § 5330 did not become effective

until January 1, 2021, and it allowed 180 days for the required registration.

The issue of criminal liability is governed by the substantive criminal law in effect during the operative timeframe for the indictment. *See Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925) ("It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done . . . is prohibited as *ex post facto*."); *see also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388-89 (1798); *United States v. Molina*, 407 F.3d 511, 525 (1st Cir. 2005). Thus, the applicable version of 31 U.S.C. § 5330 is the version which was is in effect from 2001 until January 1, 2021.

In short, the definition of "money transmitting business" which applies to this case only refers to "funds." This was the operative definition from 2001 to 2021. The expansive phrase "or value that substitutes for currency" does not apply in this case. As explained below, the use of the word "funds" in 2001 could not have been intended to authorize federal agencies to regulate the entire universe of virtual currency transactions, a part of the U.S. and global economy which did not even exist when Congress wrote the 2001 law.

Virtual Currency Did Not Exist in 2001, But by 2020 It Had Become a Huge Part of the Economy of the United States and the World.

"Virtual currency," also known as "cryptocurrency," is "digital money in an electronic payment system in which payments are validated by a decentralized network of system users and cryptographic protocols instead of by a centralized intermediary (such as a bank)." David W. Perkins, Cong. Rsch. Serv., R45427, *Cryptocurrency: The Economics of Money and Selected Policy Issues* (April 9, 2020) at 1, available at https://crsreports.congress.gov/product/pdf/R/R45427/3. Some of the most well-known cryptocurrencies are Bitcoin, Ether, and Litecoin. Perkins, *supra* at 7.

The first virtual currency was Bitcoin, which was invented in 2008. Bitcoin has
been described as "a decentralized form of electronic or digital currency that exists only
on the [i]nternet." *United States v. Harmon*, 474 F. Supp. 3d 76, 80, 90 (D.D.C. 2020)
(quoting *United States v. Lord*, 915 F.3d 1009, 1013 n.1 (5th Cir. 2019) and collecting
cases). Bitcoin depends on public ledgers and blockchain technology to validate changes
to the ledgers and prevent improper manipulation of the ledgers. Perkins, *supra* at 7.
Since Bitcoin's invention in 2008, it and similar virtual currencies have proliferated. *See,
Id.* at 1; *see also* Jerry Brito and Andrea Castillo, *Bitcoin: A Primer for Policymakers*,
Mercatus Center, George Mason University (2013) at 1, available
at https://www.mercatus.org/system/files/Brito_BitcoinPrimer.pdf/.

Virtual currencies differ from conventional, sovereign-backed currency because
"they generally do not require government backing or the involvement of an
intermediary, such as a bank" and instead rely on a "decentralized network of system
users and cryptographic protocols." Perkins, *supra* at i, 1. In addition, while money
historically has either "intrinsic value or derived value from government decree,"
cryptocurrencies "employ user agreement, a network of users, and cryptographic
protocols to achieve valid transfers of value." *Id.* at i.

The growth of virtual currencies like Bitcoin has been dramatic over the last
decade. As the Congressional Research Service explained, "[s]ince 2009,
cryptocurrencies have gone from little-known, niche technological curiosities to rapidly
proliferating financial instruments that are the subject of intense public interest." *Id.* at 1.
By 2020, the year before 31 U.S.C. § 5330 was amended, according to a 2021 Federal
Reserve analysis, approximately 12 percent of U.S. adults (roughly 31 million

Americans) "held or used cryptocurrencies in the prior year." Board of Governors of the

Federal Reserve System, *Economic Well-Being of U.S. Households in 2021* 45 (May

2022), available at https://www.federalreserve.gov/publications/files/2021-report-

economic-well-being-us-households-202205.pdf; United States Census Bureau, CB21-

208, *New Vintage 2021 Population Estimates Available for the Nation, States and Puerto

Rico* (December 21, 2021), available at https://www.census.gov/newsroom/press-

releases/2021/2021-population-estimates.html.

 Statistics regarding the rapid increase in the average number of cryptocurrency

transactions per day also make the point. The publicly available blockchain provides the

following numbers:



| | |
|---|---|
| mid-Feb '09 (30 day average): 124.7 | |
| mid-Feb '10 (30 day average): 182.5 | |
| mid-Feb '11 (30 day average): 1,368 | |
| mid-Feb '12 (30 day average): 7,028 | |
| mid-Feb '13 (30 day average): 51,553 | |
| mid-Feb '14 (30 day average): 62,362 | |
| mid-Feb '15 (30 day average): 92,905 | |
| mid-Feb '16 (30 day average): 212,292 | |
| mid-Feb '17 (30 day average): 284,922 | |
| mid-Feb '18 (30 day average): 216,104 | |
| mid-Feb '19 (30 day average): 315,583 | |
| mid-Feb '20 (30 day average): 321,950 | |

*Confirmed Transactions Per Day*, https://www.blockchain.com/charts/n-transactions (last

visited July 27, 2022).

 Along with the dramatic increase in the number of transactions, the value of this

sector of the economy has also grown tremendously. As of March 2020, when the U.S.

Dollar price of one Bitcoin was approximately $8,000, there were more than 18 million

Bitcoins in circulation with an overall market capitalization of $144 billion. Perkins, *supra* at 10. Between May 2013 (the earliest date for available data) and December 2020, the price of one Bitcoin grew from approximately $100 to nearly $30,000, and the overall market capitalization grew from roughly $1.17 billion to $530 billion. *Bitcoin to USD Chart*, https://coinmarketcap.com/currencies/bitcoin/ (last visited July 20, 2022). *See generally CFTC v. McDonnell*, 287 F. Supp. 3d 213, 218-19 (E.D.N.Y. 2018). The number of circulating Bitcoin grew from just 50 in January 2009 to more than 18 million by December 2020. *Total Circulating Bitcoin*, https://www.blockchain.com/charts/total-bitcoins (last visited July 20, 2022).

The White House reported that in "November 2021, non-state issued digital assets reached a combined market capitalization of $3 trillion, up from approximately $14 billion in early November 2016." Exec. Order No. 14,607, 87 Fed. Reg. 14,143 (Mar. 9, 2022), available at https://www.govinfo.gov/content/pkg/FR-2022-03-14/pdf/2022-05471.pdf. The White House also referenced survey data reporting that "around 16 percent of adult Americans – approximately 40 million people – have invested in, traded, or used cryptocurrencies." Press Release, White House, Fact Sheet: President Biden to Sign Executive Order on Ensuring Responsible Development of Digital Assets (Mar. 9, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/09/fact-sheet-president-biden-to-sign-executive-order-on-ensuring-responsible-innovation-in-digital-assets/. *See also* Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used Cryptocurrency*, Pew Research Center (Nov. 11, 2021), https://www.pewresearch.org/fact-tank/2021/11/11/16-of-americans-say-they-have-ever-invested-in-traded-or-used-cryptocurrency/.

To compare the $3 trillion value of "non-state issued digital assets" to another part of the economy, the coal power generation sector of the United States economy was valued at approximately $125 billion in 2021. *See Energy Explained: Electrical generation, capacity, and sales in the United States*, U.S. Energy Information Agency (July 15, 2022), https://www.eia.gov/energyexplained/electricity/electricity-in-the-us-generation-capacity-and-sales.php (reporting 2021 net generation of electricity in the United States as 4,116 billion kilowatthours (kWh), of which 21.8 percent came from coal); Tyler Hodge & Elesia Fasching, *During 2021, U.S. retail electricity prices rose at fastest rate since 2008*, U.S. Energy Information Agency (Mar. 1, 2022), https://www.eia.gov/todayinenergy/detail.php?id=51438 (reporting the nominal retail price of electricity as 13.72 cents per kilowatthour).

In short, between 2009 and 2020, virtual currency grew to become an enormous part of the United States and global economy. Moreover, virtual currency was an entirely new kind of financial instrument. It had no precedent. Finally, this new form of financial instrument was well-known to the government from 2009 to 2020, and yet, Congress did not change the definition of a "money transmitting business" in 31 U.S.C. § 5330 until January 1, 2021.

FinCEN Attempted to Authorize Itself to Regulate Virtual Currency as "Funds," Even As Other Agencies Treated It as Property or a Security, and as New Hampshire Rejected Regulation Under Its Money Transmitting Laws.

Not surprisingly, as virtual currency became a major sector of the economic world, federal regulatory agencies sought to regulate it. At best, these efforts have been inconsistent. The Internal Revenue Service has, on some occasions, treated virtual currency as property. Internal Revenue Service, *IRS Virtual Currency Guidance Notice*

*2014-21, 2014-1 C.B. 938, 2014 IRB LEXIS 238, 2014-16 I.R.B. 938,* 2014-16 I.R.B. 938 (2014). By contrast, the Securities and Exchange Commission has treated it as an "investment contract." *SEC v. Ripple Labs, Inc.*, 2022 U.S. Dist. LEXIS 43497 at *2 (S.D.N.Y. Mar. 11, 2022). And the Commodity Futures Trading Commission has classified virtual currencies as commodities. *In the Matter of: Coinflip, Inc., d/b/a Derivabit, and Francisco Riordan*,, CFTC No. 15-29, 2015 CFTC LEXIS 20 (September 17, 2015). *See also CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018).

Most notably for this case, FinCEN took nearly five years after the invention of Bitcoin to decide that virtual currency transmission was within its regulatory authority. In 2013, in FinCEN's first regulatory effort, it wrote that "'virtual' currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency." U.S. Dep't of Treasury, FinCEN, FIN-2013-G001, *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013), available at https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf. Then, six years later, FinCEN expanded this definition by describing a "convertible virtual currency" as "a type of virtual currency that either has an equivalent value as currency, or acts as a substitute for currency, and is therefore a type of 'value that substitutes for currency.'" U.S. Dep't of Treasury, FinCEN, FIN-2019-G001, *Guidance: Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies* (May 9, 2019), sec. 1.3, available at https://www.fincen.gov/sites/default/files/2019-05/FinCEN Guidance CVC FINAL 508.pdf. This is the very language – "value that substitutes for currency" – which Congress did not add to 31 U.S.C. § 5330 until 2021. Of course, that

process was the exact opposite of what the Constitution requires. The regulations are supposed to come after Congress passes the law providing the authority to regulate, not the other way around, as discussed in detail below.

In addition and amazingly, in 2019, FinCEN explicitly recognized that it was going beyond the statutory authorization to regulate the transmission of "funds." It explicitly said so:

> The term "other value that substitutes for currency" encompasses situations in which the transmission does not involve currency [defined as the coin or paper money of a country], or funds, but instead involves something that the parties to a transaction recognize has value that is equivalent to or can substitute for currency.

*Id*. at sec. 1.2.1. In plain English, FinCEN said it was going to regulate something that is not "funds" – "value that is equivalent to or can substitute for currency," such as virtual currency. Yet, FinCEN had no statutory authority to grant itself that power.

Meanwhile, at the state level, the rise of virtual currency provoked an entirely different response. New Hampshire, like many states, has its own money transmitting laws, found in N.H. RSA 399-G. As virtual currency became a large and important part of the economy, New Hampshire clarified its laws. But, rather than expanding the state registration requirement, New Hampshire specifically rejected the idea that those dealing in virtual currency should be required to register as money transmitting businesses. In 2017, the New Hampshire Legislature amended RSA 399-G:3, to exempt from registration requirements "[p]ersons who engage in the business of selling or issuing payment instruments or stored value solely in the form of convertible virtual currency or receive convertible virtual currency for transmission to another location." N.H. Rev. Stat. Ann. § 399-G:3 (LexisNexis 2022).

Finally, a good example of the conflict and inconsistences among regulators looking at virtual currency came up just last week. The SEC filed a lawsuit against employees of a cryptocurrency service, alleging insider trading. *SEC v. Wahi*, No. 2:22-cv-01009 (W.D. Wash. July 21, 2022), available at

https://www.sec.gov/litigation/complaints/2022/comp-pr2022-127.pdf. This prompted a commissioner of another agency, the Commodities Futures Trading Commission, to take issue with the SEC's claim that the cryptocurrency assets were securities. Caroline Pham, *Statement of Commissioner Caroline Pham on SEC v. Wahi*, Commodity Futures Trading Commission (July 21, 2022), available at

https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122.
Commissioner Pham, of the CFTC, issued a press release which began dramatically with a quote from the *Federalist Papers* that "The people are the only legitimate fountain of power, and it is from them that the constitutional charter…is derived." *Id.* (ellipsis in original). She then criticized the SEC, stating, "The case *SEC v. Wahi* is a striking example of 'regulation by enforcement.'" *Id.*

The inconsistencies and conflicts among regulatory agencies underscore the fact that Congress has been reluctant to take action regarding virtual currency. Certainly with regard to the definition of a money transmitting business, there is every reason to believe that Congress was aware of the issues regarding the regulation of virtual currency but chose not to expand the definition of a money transmitting business until the legislation which took effect on January 1, 2021. Yet, in the midst of this confusion and lack of action by Congress, the Department of the Treasury and FinCEN purported to require businesses like DiMezzo's to register.

The Department of the Treasury and the Financial Crimes Enforcement Network Were Not Authorized by Congress, Prior to January 1, 2021, to Require Registration of Persons Engaged in the Business of Transmitting or Exchanging Cryptocurrency for Fiat Currency.

"Agencies have only those powers given to them by Congress." *West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2609 (2022). The ordinary rules of statutory interpretation do not apply when a federal agency would presume great power from a minimal basis in the law. As recently emphasized by six members of the United States Supreme Court:

> [T]here are "extraordinary cases" that call for a different approach—cases in which the "history and the breadth of the authority that [the agency] has asserted," and the "economic and political significance" of that assertion, provide a "reason to hesitate before concluding that Congress" meant to confer such authority.

*Id.* at 2595 (quoting from *FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159-160, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000)). *See also Utility Air Regulatory Group v. E.P.A.*, 573 U. S. 302, 324, 134 S. Ct. 2427 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast "economic and political significance.") (quoting from *Brown & Williamson*, 529 U.S. at 160); *King v. Burwell*, 576 U.S. 473, 485-86, 135 S. Ct. 2480 (2015). In such cases, the Court has adopted a "major questions" doctrine to rein in "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *W. Virginia*, 142 S. Ct. at 2609.

As explained by Justice Gorsuch in his *West Virginia* concurrence, the major questions doctrine protects the Constitution's separation of powers. *W. Virginia*, 142 S. Ct. at 2617 (Gorsuch, J., concurring). Justice Gorsuch noted that "[i]n Article I, 'the People' vested '[a]ll' federal 'legislative powers . . . in Congress.' Preamble; Art. I, § 1." *Id.* Therefore, "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to

fill up the details.'" *Id.* (quoting *Wayman* v. *Southard*, 23 U.S. 1, 10 Wheat. 1, 42-43, 6 L. Ed. 253 (1825)) (Gorsuch, J., concurring). Ensuring that legislation comes from Congress and not from agencies of the Executive branch, "is 'vital to the integrity and maintenance of the system of government ordained by the Constitution.'" *W. Virginia*, 142 S. Ct. at 2617 (quoting *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 692, 12 S. Ct. 495, 36 L. Ed. 294 (1892)) (Gorsuch, J., concurring).

This is a major questions case. Virtual currency comprises a new and massive area of the economy which has provoked much political debate and social controversy. Congress did not intend, by a single word written in 2001, before virtual currency ever existed, to authorize agencies to regulate this vast part of the economy. A review of the Supreme Court's guidance regarding the major questions doctrine shows that the Department of the Treasury and FinCEN were not authorized by Congress, prior to 2021, to require registration of businesses transmitting virtual currency.

*This Case Is Like the Cases in Which the Court Has Followed the Major Questions Doctrine.*

The most recent major questions case is *West Virginia v. EPA*. In that case, Congress had authorized the EPA to regulate coal-fired power plants by setting standards for the emission of pollutants into the air. After years of reading the statutory authority as focused on the emission of pollutants from individual plants, the EPA adopted a new and expansive view of its regulatory authority. The EPA imposed regulations not aimed at the emission of pollutants from individual plants, but rather at the place of coal-fired plants in the entire electricity generation grid. The EPA reasoned that the authority to restrict pollutants included the authority to restrict the production of electricity from coal-fired plants so that more electricity would be produced from wind, solar, and sources of energy

which produced fewer pollutants. Thus, the EPA adopted regulations which required that coal-fired plants either reduce their own production of electricity or subsidize production from cleaner sources. However, the Supreme Court rejected this assertion of regulatory authority as invalid. The Court found that the major questions doctrine applied because the EPA was attempting to "substantially restructure the American energy market." *W. Virginia*, 142 S. Ct. at 2610. Although there was a "plausible textual basis" in the statute for the EPA's actions, the Court found it "'highly unlikely that Congress would leave' to 'agency discretion' the decision of how much coal-based generation there should be over the coming decades." *Id.* at 2609, 2613 (quoting *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U.S. 218, 231, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994)). A "decision of such magnitude and consequence rests with Congress itself." *W. Virginia*, 142 S. Ct. at 2616. Therefore, the Court invalidated the regulatory scheme adopted by the EPA.

*West Virginia v. EPA* relied heavily on the history of major questions cases. For example, in *Brown & Williamson*, the Court found that statutory authority of the Food and Drug Administration to regulate "drugs" and "devices" did not extend to the power to regulate, and even ban, tobacco products. *Id.* at 126-127, 137. The Court rejected the FDA's "expansive construction of the statute," because "Congress could not have intended to delegate" so much power "in so cryptic a fashion." *Id.* at 160.

Similarly, in *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. ___, 141 S. Ct. 2485, 2487, 210 L. Ed. 2d 856 (2021) (*per curiam*), the Court found that the Centers for Disease Control (CDC) did not have the authority to impose a nationwide ban in evictions in response to the COVID-19 pandemic. While the

CDC has the authority to impose regulations "necessary to prevent the . . . spread of" disease, Congress could not have intended, without expressly saying so, to authorize the CDC to institute a nationwide eviction moratorium. *Id.* at 2487, 2489.

In *Utility Air Regulatory Group v. E.P.A.*, the Court addressed another question regarding the EPA's authority. The issue was whether the EPA could construe the term "air pollutant," in a specific provision of the Clean Air Act, to cover greenhouse gases. *Id.* at 310-13. Although there was some basis in the text of the relevant statute, the Court held that permitting the EPA to assume such authority would have allowed it to regulate millions of small sources, such as hotels and office buildings, that had never before been subject to such requirements. *Id.* at 310. In the absence of clear authorization from Congress, the Court declined to uphold the EPA's claim of "unheralded" regulatory power over "a significant portion of the American economy" *Id.* at 324 (quoting *Brown & Williamson*, 529 U.S. at 159).

In *Gonzales* v. *Oregon*, 546 U. S. 243, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006), the Court rejected the Attorney General's claim that he could rescind the license of any physician who prescribed drugs for assisted suicide when the only basis for the claimed authority was a statute permitting the revocation of licenses in the "public interest." The Court found the "idea that Congress gave [the AG] such broad and unusual authority through an implicit delegation . . .[was] not sustainable." *Id.* at 267. Likewise, in *National Federation of Independent Business* v. *Occupational Safety and Health Administration*, 595 U. S. ___, 142 S. Ct. 661, 211 L. Ed. 2d 448 (2022) (*per curiam*), the Court rejected the idea that the Occupational Safety and Health Administration's authority to regulate occupational hazards justified a regulation requiring "84 million Americans . . . to either

obtain a COVID-19 vaccine or undergo weekly medical testing at their own expense." *Id.* at 665.

The circumstances now before this court are very much like these prior Supreme Court cases. A federal agency, FinCEN, decided to regulate a multi-trillion-dollar sector of the economy in which tens of millions of Americans participate, solely on the basis of one word – "funds" – in a statute written long before virtual currency existed. Regardless of whether there is possible textual basis for viewing virtual currency as "funds," there is very little basis to think that Congress intended in 2001 to convey such vast power to a federal agency. Congress did not know about virtual currency at the time because it did not exist. More importantly, it is highly unlikely that Congress intended "to delegate such a sweeping and consequential authority in so cryptic a fashion." *W. Virginia v. EPA*, 142 S. Ct. at 2608 (cleaned up); *Brown & Williamson*, 529 U. S. at 160.

*A Colorable Textual Argument Is Not Enough to Overcome the Major Questions Issue.*

To be clear, the argument in this motion is not about the mere definition of "funds." Defendants in other cases have argued that 18 U.S.C. § 1960 and 31 U.S.C. § 5530 do not apply to Bitcoin or virtual currency because those do not fall within the definition of "funds," "money," etc. Applying ordinary principles of statutory construction, courts have roundly rejected that argument. *See, e.g., United States v. Harmon*, 474 F. Supp. 3d 76, 80, 90 (D.D.C. 2020) ("the Court concludes that bitcoin is money"; collecting cases reaching the same conclusion); *United States v. Murgio*, 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) ("Bitcoins Are 'Funds' Under § 1960"); *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) ("Bitcoin clearly qualifies as 'money' or 'funds'"); *But see United States v. Petix*, No. 15-CR-227A, 2016 U.S. Dist.

LEXIS 165955, at *20 (W.D.N.Y. Dec. 1, 2016) ("Because Bitcoin does not fit an ordinary understanding of the term 'money,' Petix cannot have violated Section 1960 in its current form.").

That is not the argument here. To the contrary, that argument misses the point. The issue is not whether, in a dictionary or in common usage, virtual currency would fall within the definition of "funds." The issue is whether, in 2001, Congress would have prophesied the invention of an entirely new kind of financial instrument in 2008 and its rise to become a multi-trillion dollar sector of the economy, and then, based on that prediction, prospectively authorized the regulation of virtual currency by the use of one word.

The *West Virginia v. EPA* majority noted that, in each of the major questions cases, there was "colorable textual authority" for the assertion of the power to regulate. *W. Virginia*, 142 S. Ct. at 2609. However, that is insufficient where a major question is involved. It is simply "common sense" that Congress would not give an agency great power without detailed and explicit authorization. *Id.* (quoting *Brown & Williamson*, 529 U.S. at 133).

> Extraordinary grants of regulatory authority are rarely accomplished through "modest words," "vague terms," or "subtle device[s]." *Whitman v. American Trucking Assns, Inc.*, 531 U. S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001). Nor does Congress typically use oblique or elliptical language to empower an agency to make a "radical or fundamental change" to a statutory scheme. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U. S. 218, 229, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994).

*W. Virginia*, 142 S. Ct. at 2609.

Thus, "separation of powers principles and a practical understanding of legislative intent," *W. Virginia*, 142 S. Ct. at 2609, counsel against interpreting a single word to

convey vast power, effectively finding "elephants in mouseholes." *Whitman*, 531 U.S. at 468. A regulatory agency must show "something more than a merely plausible textual basis.…The agency instead must point to 'clear congressional authorization' for the power it claims." *W. Virginia*, 142 S. Ct. at 2609 (quoting *Utility Air*, 573 U.S. at 324).

*The Age of the Statute on Which the Regulation Is Based Shows that Congress Did Not Intend to Regulate Cryptocurrency.*

The Court has also explained that when "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' *Brown & Williamson*, 529 U.S., at 159, we typically greet its announcement with a measure of skepticism." *Utility Air*, 573 U.S. at 324. For example, in *NFIB v. OSHA*, 142 S. Ct. at 666, the Court rejected OSHA's attempt to impose a COVID vaccine mandate based on a statutory provision adopted 40 years before the pandemic.

The same principles apply here. It is highly unlikely, if not inconceivable, that when Congress used the word "funds" in the 2001 amendment to 31 U.S.C. § 5330, it was anticipating the advent of virtual currency and a seismic change in the national and world economy. As described in detail above, not only was that development very likely unforeseen, it also created conflict among federal agencies and between the federal government and state governments. It is simply not the case that virtual currency emerged and everyone agreed that it is already well-covered by existing law. The exact opposite is true. No doubt that is why Congress did not amend the statute until 2021.

*Conclusion: Counts One and Three Must Be Dismissed*

Federal agencies do not make law. Congress makes law. In this case, the federal agency FinCEN tried to make law. It tried to grant itself the authority to require the registration of businesses exchanging virtual currency for fiat currency. FinCEN had no such authority because Congress had not given it that authority. For that reason, Aria DiMezzo cannot be convicted of operating, or conspiring to operate, such a business without registering with FinCEN. The court should dismiss Counts One and Three.

The defense seeks a hearing on this motion if the Government denies any of the facts cited within. The defense notes that it has cited Government sources for many factual assertions. In addition, the defense seeks a hearing if further argument or questions would assist the court in addressing this motion.

No additional memorandum is filed because all authorities necessary for the court to grant this motion are cited herein.

This is a dispositive motion and the defense presumes the Government's objection.

WHEREFORE the defense requests that the court order a hearing if the Government objects to any facts asserted here or if the court prefers a hearing, and that, thereafter, the court grant this motion dismissing Counts One and Three of the superseding indictment.

Date: July 29, 2022.                                      Respectfully submitted,

                                                         */s/ Richard Guerriero*
                                                         Richard Guerriero, Esq.
                                                         N.H. Bar ID. 10530
                                                         Legal Intern: Oliver Bloom
                                                         Lothstein Guerriero, PLLC
                                                         Chamberlain Block Building
                                                         39 Central Square, Suite 202
                                                         Keene, NH 03431
                                                         Telephone: (603) 352-5000
                                                         richard@nhdefender.com


## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent

electronically to registered participants identified on the Notice of Electronic Filing

(NEF) and paper copies will be sent to the nonregistered participants on the date the

document was signed by me.

                                                         */s/ Richard Guerriero*
                                                         Richard Guerriero, Esq.