UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:21-cr-41-JL |
| IAN FREEMAN and | ) | |
| ARIA DIMEZZO | ) | |

UNITED STATES' OBJECTION TO
DEFENDANT'S MOTION TO DISMISS COUNTS ONE, TWO, AND THREE

I.    INTRODUCTION.

Among other crimes, Ian Freeman and Aria Dimezzo are charged with operating

unlicensed money transmitting businesses in violation of 18 U.S.C. § 1960(b)(1)(B) (Counts

Two and Three) and conspiring to do so in violation of 18 U.S.C. § 371 (Count Three). The

allegation for these counts is that the defendants operated unlicensed money transmitting

businesses in which they accepted fiat currency, converted that fiat currency into primarily

bitcoin and transmitted that bitcoin from a bitcoin wallet they controlled to a bitcoin wallet

controlled by someone else.[1]  For the defendants' service in transmitting the bitcoin, the

defendants kept a portion of the fiat currency as a fee. In aggregate, many millions of dollars

flowed through these money transmitting businesses.

Title 18, Section 1960(b)(1)(B) makes it a crime to conduct, control, manage, supervise,

direct or own a "money transmitting" business if that business fails to comply with the money

transmitting business registration requirements under 31 U.S.C. § 5330, or the regulations

prescribed pursuant to that statute.   Section 1960 defines "money transmitting" as "transferring

---

[1]      Fiat currency "is government-issued money, like dollars and euros."  Greene V. Mizuho
Bank, Ltd., 169 F. Supp. 3d 855, 858 (N.D. Ill. 2016).  The indictment uses the broader term
"virtual currency" but the evidence at trial will be that most transactions involved the
transmission of the virtual currency bitcoin.

funds on behalf of the public by any and all means. . . ."  18 U.S.C. § 1960(b)(2).  And § 5330 requires registration by a person who "engages as a business in the transmission of funds" so long as the person is also a domestic "financial institution" required to file currency transaction reports under 31 U.S.C. § 5313.  A financial institution is also, inter alia, a "person who engages as a business in the transmission of funds." 31 U.S.C. § 5312(a)(2)(R).  Thus, the three operative statutory phrases necessary to prove a violation of § 1960(b)(1)(B) use the terms transmission or transfer of "funds."  Numerous courts have held that "funds" unambiguously includes bitcoin. United States v. Mansy, 2017 WL 9672554, at *1-2 (D. Me. May 11, 2017) (collecting authority).

Consistent with this view, the Secretary of the Treasury, through FinCEN, adopted regulations that specify that a "money services business" must register with the Secretary pursuant to 31 U.S.C. § 5330. 31 C.F.R. § 1022.380. A "money services business" includes, inter alia, a money transmitter which is a person that "accept[s] funds . . . and transmits . . . funds . . . to another person or location by any means . . . [or] any other person engaged in the transfer of funds." 31 C.F.R. § 1010.100(ff)(5)(i)(A)-(B).  Thus, the regulations track the statute insofar as it requires registration by a person who transmits "funds."  FinCEN published guidance in 2013 making clear that the definition of money transmitter "does not differentiate between real currencies and convertible virtual currencies." Therefore, the regulations cover a person engaged in the business of transmitting virtual currency. FinCEN Guidance-2013-G001, https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf

The defendants argue for dismissal of Counts One, Two, and Three on the ground that the regulations requiring a bitcoin money transmitter to register with the Secretary of the Treasury are invalid under the "major question" doctrine. West Virginia v. EPA, 142 S. Ct. 2587 (2022).

Specifically, the defendant says that the Secretary of the Treasury bit off more than he can legally chew by deciding that virtual currency transmitters must adhere to the same registration requirements as transmitters of fiat currency.

The argument fails twice over.  First, the statutory scheme, by its plain language, requires the defendant to register their businesses because bitcoin is a form of funds. Therefore, the registration requirement is set by § 5330(d)(1), regardless of the regulations. Because there is no need to consult the regulations to determine that a bitcoin money transmitter must register, the major question doctrine is beside the point.

Second, there is nothing wrong with the regulations.  The regulations reasonably construe virtual currency as a form of funds transmission covered by the § 5330 registration requirement. Unlike in the major question doctrine cases cited by the defendant, the Secretary of the Treasury took no extraordinary remedial action based on its conclusion that virtual currency transmitters are covered. It merely mandated that such transmitters follow the same registration requirement as other covered money transmitters.  Thus, the Department of Treasury here was doing what agencies do – reasonably construing statutory text to determine a law's coverage and then imposing a well-trodden regulatory regime on the covered entities. That isn't a major question; it is an example of standard agency practice.

II.    <u>STANDARDS FOR MOTION TO DISMISS AN INDICTMENT</u>.

"Dismissing an indictment is an extraordinary step." <u>United States v. Li</u>, 206 F.3d 56, 62 (1st Cir. 2000). In the normal course of events, a facially valid indictment returned by a duly constituted grand jury calls for a trial on the merits. <u>United States v. Stokes</u>, 124 F.3d 39, 44 (1st Cir. 1997). In addressing a motion to dismiss, the Court must accept all the allegations in the indictment as true.  Dismissal is only warranted where those facts do not state a claim because

the defendant has presented a valid and dispositive legal challenge. United States v. Rodriguez-Rivera, 918 F.3d 32, 34 (1st Cir. 2019). There is no factual dispute here that the defendants' money transmitting business involved the transmission of bitcoin. Thus, dismissal of the § 1960(b)(1)(B) count and related conspiracy count is only warranted if this Court concludes that, as a matter of law, a person engaged in the business of transmitting bitcoin cannot be found guilty of an offense under § 1960(b)(1)(B).

III.   THE STATUTORY SCHEME REQUIRES REGISTRATION
       WITHOUT REFERENCE TO THE REGULATIONS.

The defendants' argument for dismissal hinges on the contention that the Secretary of the Treasury lacks the power to require by regulation the registration of a business engaged in transmitting bitcoin. The defendant says that the Secretary lacks this power because regulating bitcoin or other virtual currencies is a so-called major question which requires congressional action. The argument goes like this: no congressional action, invalid regulation, no crime.

But that argument only requires consideration insofar as the government must prove that the defendants violated the Secretary's regulations as an element of the charged crime, 18 U.S.C. § 1960(b)(1)(B). Thus, the necessity of the government proving a violation of the regulations to establish the offense is a critical predicate for the defendants' argument. The operative part of § 1960 renders a money transmitting business to be unlicensed if that business "fails to comply with the money transmitting business registration requirements under section 5330 or regulations prescribed under such section." 18 U.S.C. § 1960(b)(1)(B) (emphasis supplied).

"Or" is a word that "almost always" means the disjunctive. Loughrin v. United States, 573 U.S. 351, 358 (2014). Thus, the government can prove its case either by showing a violation of the registration requirement as defined by stature or by showing a violation of the requirements under regulations properly promulgated pursuant to the statute. In the

government's view, the statute (§ 5330), by its plain terms, requires a business engaged in transmitting bitcoin to register.  Because that is so, this Court can reject the defendants' challenge to the indictment without reaching the validity of the related regulations.

To evaluate the government's argument that this motion can be resolved on the statutory text alone, the first step is to trace the histories of 18 U.S.C. § 1960 and 31 U.S.C. § 5330. Section 1960 was initially enacted in 1992. Pub. Law 102-552, § 1512.  In its first iteration, the statute made it a crime to knowingly conduct an "illegal money transmitting business."  The definition of "money transmitting" is the same as it is today – the "transferring of funds on behalf of the public by any and all means . . . . " Id. at § 1512(b)(2).  The law only made such a business illegal, however, if the defendant operated the business without a required state license where failing to have the state license is a state crime. Id. at § 1512 (b)(1)(A-B).  The law required that the defendant act intentionally, which courts construed to mean that the defendant knew that a state license was required.  E.g., United States v. Rahman, 417 F. Supp. 2d 725, 728 (E.D.N.C. 2006).

Just two years later, in § 408 of the Riegle Community Development and Regulatory Improvement Act, Congress enacted 31 U.S.C. § 5330 and amended 18 U.S.C. § 1960. Pub. Law 103-325.  The Congressional finding for this section were as follows:

FINDINGS.

A)  Money transmitting businesses are subject to the recordkeeping and reporting requirements of subchapter II of chapter 53 of title 31, United States Code.

(B)  Money transmitting businesses are largely unregulated businesses and are frequently used in sophisticated schemes to—

(i)  transfer large amounts of money which are the proceeds of unlawful enterprises; and

(ii)    evade the requirements of such subchapter II, the Internal Revenue Code of 1986, and other laws of the United States.

(C)    Information on the identity of money transmitting businesses and the names of the persons who own or control, or are officers or employees of, a money transmitting business would have a high degree of usefulness in criminal, tax, or regulatory investigations and proceedings.

PURPOSE.

It is the purpose of this section to establish a registration requirement for businesses engaged in providing . . . money transmitting or remittance services to assist the Secretary of the Treasury, the Attorney General, and other supervisory and law enforcement agencies to effectively enforce the criminal, tax, and regulatory laws and prevent such money transmitting businesses from engaging in illegal activities.

To effectuate this purpose, Congress mandated that any person who owns or controls a "money transmitting business" shall register with the Secretary of the Treasury within 180 days. Pub. Law § 408(b), now codified at 31 U.S.C. § 5330(a)(1).  Thus, the statute requires registration by a money transmitting business as defined by the statute.  Kingdomware Tech. v. United States, 579 U.S. 162, 171-72 (2016) (noting that when Congress uses the word "shall" it "usually connotes a requirement").

In its first iteration, § 5330(d)(1) defined a "money transmitting business" to mean any business which: (a) provides check cashing, currency or money transmitting or remittance services; (b) is required to file reports under section 5313; and (c) is not a depository institution (as defined in 5313(g)).[2]  31 U.S.C § 5330(d)(1)(A-C). The same section of this 1994 law also

---

[2]    Title 31, Section 5313 is the provision that requires "domestic financial institutions" to file currency transaction reports. One type of financial institution for purposes of this section is any "person that engages as a business in the transmission of currency or funds . . ." 31 U.S.C. § 5312(a)(2)(R). This section was added as part of the USA Patriot Act.  Pub. Law 107-56, § 359(a). Section 5313(g) of Title 31 defines depository institution.  The government does not believe that there is any dispute that the businesses alleged to have been operated by the defendants were not depository institutions as defined § 5313(g).

redefined an "illegal money transmitting business" under 18 U.S.C. § 1960 to include a business that "fails to comply with the money transmitting business registration requirements under section 5330, of title 31, United State Code or regulations prescribed under such section." Pub. Law 103-325, § 408(c).  It is clear from this enactment that Congress considered § 1960 to be the criminal enforcement mechanism for failing to follow the § 5330 registration requirement.

The next round of congressional action came in 2001 as part the USA Patriot Act. In that Act, Congress expanded the definition of "a money transmitting business" under § 5330(d)(1)(A) to include "any other person who engages as a business in the transmission of funds, including any person who engages as business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system." Pub. Law 107-56, § 359(b).  This changed captured some of the more esoteric financial relationships such as hawalas that were used to facilitate criminal or terrorist activity.  United States v. Uddin, 365 F. Supp. 2d 825, 827 (E.D. Mich. 2005).

In the Patriot Act, Congress also strengthened § 1960 by making clear that the defendant cannot defend against a prosecution under this section by arguing that he or she did not know that registration with the Secretary of the Treasury was required, i.e., it clarified that § 1960(b)(1)(B) is a general intent crime. United States v. Keleta, 441 F. Supp. 2d 1, 2-3 (D.D.C. 2006).  In addition, it added to the definition of an unlicensed money transmitting business by including a business "that involves the transportation of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." Pub. Law 107-56 § § 373(a) (codified at 18 U.S.C. § 1960(b)(1)(C).

Those are the pertinent amendments to § 1960 and § 5330 for purposes of this case.

Thus, under the applicable law, it is a crime for a person, who controls a "money transmitting

business" as defined under § 1960, to fail to register that business with the Secretary of the

Treasury as required by § 5330.   Section 5330, in turn, requires registration by a "money

transmitting business" as defined by that section so long as the business is also required to file

currency transaction reports under 31 U.S.C. § 5313.

As already mentioned, Section 1960 defines "money transmitting" as "transferring funds

on behalf of the public by any and all means . . . " Section 5330 defines a "money transmitting

business" as a business that "engages in the transmission of funds."  And the § 5313 currency

transaction report requirement applies to "financial institutions," which includes a business that

"engages in the transmission of funds." 31 U.S.C. § 5312(a)(2)(R).

This somewhat laborious explanation of the statutory scheme reduces to this: The

requirements of § 1960, § 5330 and § 5313 all pertain to businesses engaged in the "transfer"

(§ 1960) or "transmitting" (§ 5330 and § 5313) as defined in § 5312)) of "funds" (§ 1960, § 5330,

and § 5313 (as defined in § 5312)).  Therefore, a business that converts fiat currency into bitcoin

and then sends the resulting bitcoin as directed is covered by the relevant statutes so long as

bitcoin constitutes "funds" and sending bitcoin is "transmitting or transferring" funds.[3]

Bitcoin is a decentralized form of electronic or digital currency that exists only on the

internet. United States v. Lord, 915 F.3d 1009, 1013 n.1 (5th Cir. 2019). Bitcoin (with a capital

"B") is the "peer-to-peer network enabling proof and transfer of ownership . . . without involving

---

[3]      Transferring or transmitting are synonyms.  They both mean "to convey to another person
or place."  United States v. Harmon, 474 F. Supp. 3d 76, at 102-103 (D.D.C. 2020).  There is no
argument here that the defendants' sending bitcoin from their wallet to someone else's bitcoin
wallet fails to constitute conveying the bitcoin to another person or place, i.e., transferring or
transmitting the bitcoin.

a third-party such as a bank."  And bitcoin (small "b") is the unit of virtual currency that is

transacted over the internet using Bitcoin software.  United States v. Sterlingov, 573 F. Supp. 3d

28, 30-31 (D.D.C. 2021).

     A bitcoin transaction works as follows.  Each Bitcoin participant has at least one address,

defined by a string of letters and numbers, which is like a bank account.  United States v.

Gratkowski, 964 F.3d 307, 309 (5th Cir. 2020). These addresses are called "wallets."  Keliman v.

Wright, 2018 WL 6812914, at *1 (S.D. Fla. Dec. 27, 2018).  Bitcoin participants can send

bitcoin through their wallets to someone else's wallet using a private key which functions as the

authorization for payment. Gratkowski, 964 F.3d at 309. A bitcoin transaction is posted to a

public ledger, called the blockchain. Id. The blockchain contains the sender's wallet address, the

receiver's wallet address, and the amount of bitcoin transferred. Id. The owners of the wallets

however are anonymous on the blockchain. Id.  Because "bitcoin offers users increased

anonymity compared with many other virtual and traditional currencies . . . [it is] more difficult

for law enforcement to quickly and efficiently obtain information on users engaged in criminal

activity."  United States v. Lebedev, 932 F.3d 40, 46 n.2 (2d Cir. 2019).

     Many courts have considered whether the term "funds" as used in § 1960's definition of a

"money transmitter" includes a business that transfers bitcoin.  The courts are unanimous that the

plain language of "funds" does indeed include bitcoin. See United States v. Ologeanu, 2020 WL

1676802, at *11 (E.D. Ky. Apr. 4, 2020); United States v. Stetkiw, 2019 WL 417404, at *2 (E.D.

Mich. Feb. 1, 2019); Mansy, 2017 WL 9672554, at *1 United States v. Murgio, 209 F. Supp. 3d

698, 707 (S.D.N.Y. 2016); United States v. Budovsky, 2015 WL 5602853, at *14 (S.D.N.Y.

Sept. 23, 2015); United States v. Faiella, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014); see also

United States v. Iossifov, __ F. 4th__, 2022 WL 3335692, at *6 (6th Cir. Aug. 12, 2022); United States v. Harmon, 474 F. Supp. 3d 76, 90 (D.D.C. 2020).[4]

The argument presented in these decisions is straightforward. The terms "funds" means "available money" or "an amount of something available for use."  And "money" is "something generally accepted as a medium of exchange, a measure of value, or a means of payment."  An example of money is a "money of account" which is defined as "a denominator of value or basis of exchange which is used in keeping account and for which there may or may not be an equivalent coin or denomination of paper money." Based on these "plain meaning definitions . . . bitcoin clearly qualifies as money or funds [because] bitcoin can be easily purchased in exchange for ordinary currency, acts a denominator of value, and is used to conduct financial transactions." Faiella, 39 F. Supp. 3d at 545.

The defendants do not dispute any of this.  Indeed, they acknowledge that "defendants in other cases have argued that 18 U.S.C. § 1960 and 31 U.S.C. § 5[3]30 do not apply to Bitcoin or virtual currency because those do not fall within the definition of definition of funds, money, etc. [and] that applying ordinary principles of statutory construction, courts have roundly rejected that argument."[5] Def. Mem. at 19. The defendant then makes clear "that is not the argument here" because they are challenging the regulations, not the statute. Id. at 20.

---

[4]    The only contrary authority is United States v. Petix, 2016 WL 7017919, at *5 (W.D.N.Y. Dec. 1, 2016), which suggests that the term money contemplates connection to a government.  But as other courts have observed this is a magistrate judge's report and recommendation that was never adopted by a district court. E.g., Harmon, 474 F. Supp. 3d at 90.

[5]    The defendants wrote § 5530 in their motion but that appears to be a typographical error for "5330" and a common one at that. Harmon, 474 F. Supp. 3d at 101; United States v. Talbnejad, 342 F. Supp. 2d 346, 355 (D. Md. 2004).

But that begs the question.  If, as the defendants concedes, § 5330 unambiguously applies to require registration by bitcoin transmitters by virtue of the statute's use of the term "funds," then there is no need to resort to the regulations.  The statute itself requires the defendants' business to register with the Secretary of the Treasury.

By way of example, in <u>Budovsky</u>, a defendant challenged an indictment under § 1960(b)(1)(B). The defendant said that the indictment failed because there was no Department of Treasury regulation that required an entity engaged in the transmission of virtual currency to file currency transaction reports.  (Recall that to be a 'money transmitting business' under § 5330 and thus to have violated § 1960(b)(1)(B), the business also must be required to file currency transaction reports under § 5313).  The court rejected that argument because there was no need to resort to the regulations to determine that a business engaged in transmitting virtual currency had to file currency transaction reports and register:

> [C]riminal liability under § 1960(b)(1)(B) rests in part on a failure to comply with registration requirements, including those set forth in § 5330 or in § 5330's regulations. 18 U.S.C. § 1960(b)(1)(B). Section 5330 requires money transmitting businesses to register and defines such businesses as those that are required to file reports under § 5313, among other things. 31 U.S.C. § 5330(d)(1). Section 5313, on which the defendant rests his argument here, requires a "domestic financial institution" to file CTRs. 31 U.S.C. § 5313(a). As described above, domestic financial institutions are further defined broadly to include businesses engaged in the transmission of funds, including international money transfer networks. 31 U.S.C. §§ 5312(a)(2)(R), (b)(1). Read together, these provisions require virtual currency transfer businesses to register with the Department of the Treasury.

<u>Budovsky</u>, 2015 WL 5602853, at *9.  Thus, as <u>Budovsky</u> makes clear, the statutory provisions alone "require virtual currency transfer businesses to register with the Department of Treasury." Because this analysis is correct, the defendants' obligation to register and thus their liability under § 1960(b)(1)(B) for failing to do so is established entirely by the statutory text of

§§ 5330(d)(1)(A), 5313(a)(2) and 5312(a)(2)(R). <u>See also</u> <u>United States v. E-Gold</u>, 550 F. Supp.

2d 82, 95 (D.D.C. 2008). Therefore, the Secretary's accompanying regulations are irrelevant to

this prosecution.  Thus, there is no reason for this Court to consider the defendants' argument that

those regulations are invalid.  For this reason, the Court should reject the defendants' motion to

dismiss Counts One, Two and Three.

IV.        EVEN IF RESORT TO THE REGULATIONS IS
           <u>NECESSARY, THE REGULATIONS ARE VALID</u>.

           Assuming arguendo and contrary to the argument presented above, that the text of § 5330

is ambiguous on whether a virtual currency transmitting business must register with the

Secretary of Treasury, there is no dispute that the regulations promulgated pursuant to § 5330

require registration. And recall that the government can prove a violation of § 1960(b)(1)(B) by

showing <u>either</u> that registration was required by the statute <u>or</u> by the regulations prescribed

thereunder.  <u>Supra</u> at 4.

           Regulations promulgated pursuant to § 5330 require that all money service businesses

register with FinCEN. 31 C.F.R. § 1022.380(a)(1).  One type of money service business is a

"money transmitter" which is a person that provides "money transmission services."  "Money

transmission services" includes "the acceptance of currency, funds or other value that substitutes

for currency from one person and the transmission of currency, funds or other value that

substitutes for currency to another location or person by any means." 31 C.F.R.

§ 1010.100(ff)(5)(1)(A).  Guidance issued by FinCEN in 2013 observed that "the definition of a

money transmitter contained in 31 C.F.R. § 1010.100(5)(1)(A) does not differentiate between

real currencies and convertible virtual currencies." FIN-2013-G001, Application of FinCEN's

Regulations to Persons Administering, Exchanging or Using Virtual Currency, (found at

<u>https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf</u>); <u>Budovsky</u>, 2015 WL

5602853, at *10. Thus, regulations have long made clear that transmitters of virtual currency, such as bitcoin, must register with the Secretary of the Treasury under § 5330.

The question presented here is whether these regulations are valid. The defendants say that they are not because deciding that a transmitter in virtual currency is a "money transmitter" is a question only Congress can resolve because it is a so-called "major question." The defendants posit that this is so because when Congress amended § 5330 in 2001 to define a money transmitting business to include "a person who engages as a business in the transmission of funds," virtual currency did not yet exist. Thus, any regulatory construction of "funds" cannot possibly be consistent with congressional intent since Congress could not have had any intent for the Secretary to regulate something that did not yet exist.

This argument misapprehends basic administrative law principles. In determining whether a challenged regulation is valid a reviewing court must first determine if the regulation is consistent with the language of the statute. Chevron v. NRDC, 467 U.S. 837, 842-43 (1984). If the statute is silent or ambiguous with respect to the specific issue addressed by the regulation, the question becomes whether the agency regulation is a permissible construction of the statute. Chemical Manufacturers Assn v. NRDC, 470 U.S. 116, 125 (1985). If the agency regulation does not conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute. United States v. Boyle, 469 U.S. 241, 246 n.4 (1985). "[B]ecause a new application of a broad statutory term can always be reframed as an expansion of agency authority, the question in every case is simply, whether the statutory text forecloses the agency's assertion of authority or not." Corbett v. Transportation Security Administration, 19 F.4th 478, 485 (D.C. Cir. 2021).

Here, Congress explained in 1994, when it first enacted 31 U.S.C. § 5330, that it perceived a substantial problem insofar as money transmitting businesses are largely unregulated businesses and are frequently used in sophisticated schemes to transfer large amounts of money which are the proceeds of unlawful enterprises. Pub. Law 103-325, § 408.  And in 2001, Congress expanded the coverage of § 5330 by enacting the broad statutory term "a business engaged in the transmission of funds" to describe, in part, who must register. As discussed earlier (and to which the defendant does not contest), the plain meaning of "funds" includes bitcoin. Supra at 9-10.

Also, as mentioned above, the defendant's only response is to say that Congress did not know about bitcoin in 1994 and 2001, and therefore Congress was not specifically thinking about bitcoin when it adopted the broad "transmission of funds" language to define entities that must register under § 5330.  And the answer to that argument is so what?

The Supreme Court has recognized that an older Congress may not have appreciated a particular future development when it passed a comprehensive statute.  Therefore, it conferred broad authority on the agency so that the agency would have the wherewithal to deal with changing circumstances consistent with Congress' overall public policy objective. United States v. Southwestern Cable Co., 392 U.S. 157, 172 (1968); Cablevision Systems Corp. v. FCC, 649 F.3d 695, 707 (D.C. Cir. 2011).

That is precisely the situation here. Congress expressed concern about money transmitting businesses being used to move large amounts of money that are the proceeds of illegal activity. As the evidence at trial will demonstrate, that is exactly the harm the defendants caused.  They accepted large amounts of fiat currency from elderly victims of various wire fraud scams, turned that currency into bitcoin (minus a large fee) and sent the bitcoin to an anonymous

wallet presumably controlled by the scammer so that the scam proceeds would be untraceable by the victim, banks, or law enforcement. While Congress did not know about bitcoin in 1994 and 2001, it did know that businesses analogous to the defendants' businesses were platforms for money laundering. Congress used the broad phrase "funds" to give the Secretary of the Treasury the necessary bandwidth to deal with "unforeseen development[s]" in financial innovation, such as virtual currency, so that the statute's objective of preventing money transmission from being a criminal's tool for hiding ill-gotten gains could be realized as the financial industry continued to evolve. Cablevision Systems Corp., 649 F.3d at 707.

The defendants claim nevertheless that the Supreme Court's recent decision in West Virginia v. EPA, 142 S. Ct. 2587 (2022), changes the playing field so that the long-standing administrative law principles relied on above no longer control. The defendants are wrong.

West Virginia, 142 S. Ct. at 2602, involved the EPA's so-called Clean Power Plan. EPA decided, under its rarely used § 111(d) powers, to regulate pollutants from so-called existing sources.  Using this authority, the EPA decided to regulate carbon dioxide emissions from coal power plants.  The agency's plan involved three building blocks. Id. at 2603. The first building block was to require certain upgrades in technology to existing plants that would reduce emissions from covered plants.  Id. This is the traditional method that the EPA has used to obtain clean air improvement.  Id.  But the EPA determined that this first building block would not lead to a sufficient reduction in carbon dioxide. Id.  The second two buildings were more radical. One required a shift in electricity production for existing coal-fired power plants to natural-gas fired power plants and the other required transitions to a low or zero-carbon generating capacity that is provided by wind or solar. Id.  The EPA said that the industry could meet these requirements by (1) reducing production; (2) building new gas, wind, or solar plants; or (3)

participating in a cap-and-trade-regime in which coal-fired plants could purchase emission allowances from sources that had reduced their carbon emissions. Id.

The Supreme Court invoked the "major questions" doctrine to conclude that the Clean Power Plan exceeded the EPA's authority. For present purposes, it is critical to identify the aspect of the Clean Power Plan that created the major question which Congress, not the agency, was required to answer.

The Supreme Court did not conclude that the EPA overstepped its bounds by identifying carbon dioxide as something that causes "air pollution" – the statutory term selected by Congress to define what substances the EPA could regulate under § 111—such that some type of regulations was possible. Rather, "the issue [was] whether restructuring the Nation's overall mix of electricity generation" was a permissible remedial action for the agency to take. West Virginia, 142 S. Ct. at 2607. According to the Court, the agency's mistake under the major question doctrine was to undertake such an ambitious remedial after identifying carbon dioxide as type of "air pollution." As the Court explained:

> [T]his is a major questions case. In arguing that Section 111(d) empowers it to substantially restructure the American energy market, EPA claimed to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority. It located that newfound power in the vague language of an ancillary provision of the Act, one that was designed to function as a gap filler and had rarely been used in the preceding decades. And the Agency's discovery allowed it to adopt a regulatory program that Congress conspicuously and repeatedly declined to enact itself.

West Virginia, 142 S. Ct. at 2610. In other words, the problem was not that the EPA decided to regulate carbon dioxide; it was that it chose to do so in an unprecedented way that would cause a substantial revamping of a major American industry. The Court was skeptical that Congress

would have given the agency such dramatic remedial power without a clear statement to that effect.  Id.

The other cases described by the West Virginia Court as falling into the major-question bucket have a similar hew.  For example, there was no question that the Center for Disease Control had the power to deal with the COVID-19 pandemic, but the eviction moratorium that the CDC enacted was an "unprecedented" expansion of CDC authority in the face of Congress' decision not to extend the moratorium after having previously done so.  Alabama Assn. of Realtors v. HHS, 141 S. Ct. 2485, 2488-90 (2021).  And in Utility Air v. EPA, 573 U.S. 302 (2014), the Court rejected the EPA's determination that it could regulate green-house gasses where doing so would bring about an enormous and transformative changes in EPA's regulatory power by giving it "permitting authority over millions of small sources, such as hotels and office buildings that had never before been subject to these requirements."[6]  In sum, the major-question doctrine is reserved for "extraordinary cases" where "the history and breadth of the authority that the agency has asserted and the economic and political significance of the assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."  West Virginia, 142 S. Ct. at 2608.

This is hardly the "extraordinary case" the Supreme Court described in West Virginia. The Secretary of the Treasury construed the terms of § 5330 to cover businesses that transmit

---

[6]     Other cases are to similar effect.  In Brown & Williamson Tobacco Corp v. FDA, 529 U.S. 120, 126-27 (2000), the Court concluded that the agency did not have the ability to regulate tobacco because if it had such power, it would be required to take the extraordinary step of banning the sale of tobacco which would have a substantial effect on the United States economy and be inconsistent with other congressional enactments.  And in NFIB v. OSHA, 142 S. Ct. 661, 665-66 (2022), the Court concluded that OSHA did not have the power to mandate COVID vaccines or testing because the agency's assertion of power was "remarkable" insofar as it would mandate vaccination or testing by 84 million working Americans.

virtual currency.  That view was consistent with the federal district courts' unanimous view that "Bitcoin constitutes money and funds." <u>Ologeanu</u>, 2020 WL 1676802, at *11.[7]

The Secretary of the Treasury, having decided that bitcoin was within the realm of what he could regulate, then did nothing extraordinary.  The Secretary required bitcoin transmitters to follow the same registration requirements that businesses involved in the transmission of fiat currency must follow.  Thus, unlike the major question doctrine cases, where the agency imposed an unprecedented remedy for the problem identified, which would have a large effect on a broad section of the American economy, here the Secretary of Treasury did not assert any unusual administrative authority. The agency treated virtual currency transmitters in the same manner as fiat currency transmitters – they must register.  And for good reason since virtual currency transmitters pose the same (or even perhaps an exacerbated) risk as fiat currency transmitters in helping facilitate criminal activity, which was Congress' reason for enacting § 5330.

The defendants spend much of their memorandum convincing the Court that virtual currency is a big deal.  It is.  But there was no effort here by the Secretary of the Treasury to

---

[7]        The defendants contend that other executive-branch agencies have treated bitcoin in varying ways to suggest that there is inconsistency because not all agencies have treated it as equivalent to fiat currency. Therefore, according to the defendants, because there are different agency views this must be a major question. Even assuming there are differences in the treatment of bitcoin across the regulatory landscape, it is not clear what legal significance varying views of the agencies has since all agencies act pursuant to their own organic statutes and the policies they are charged with furthering. Here, the plain language of the statute at issue (§ 5330) has been held to cover bitcoin and the purposes articulated by Congress for requiring registration of money transmitters applies equally to virtual and fiat currency. That some other agency, applying different statutory language and public policies, may reach a different conclusion is beside the point. The defendants also discuss how New Hampshire treats registration by virtual currency transmitters differently from federal law.  That certainly is irrelevant since the failure to comply with a state registration requirement is a violation of 18 U.S.C. § 1960(b)(1)(A).  The defendants are not charged with violating that section of the law.

engage in an extensive regulation of virtual currency or virtual currency users across the economy.  The Secretary's action was limited to the small number of businesses engaged in virtual currency transmitting and the requirements placed upon that small sector are no more onerous than the requirements long placed on fiat currency transmitters.  Because both sets of transmitters (virtual and fiat) pose the same danger in facilitating criminal activity about which Congress expressed concern, the Secretary was reasonable in treating them the same way. As already mentioned, "the question in every case is simply, whether the statutory text forecloses the agency's assertion of authority." City of Arlington v. FCC, 569 U.S. 290, 301 (2013).  Here, it does not.

For these reasons, this case is akin to Massachusetts v. EPA, 549 U.S. 497 (2007) -- not West Virginia v. EPA, as the defendant contends.  In Massachusetts, the Supreme Court considered whether EPA had authority to regulate carbon dioxide under the statutory phrase "air pollutant" as it pertains to regulating car emissions. Id. at 528.  The Court concluded that the EPA had the authority to regulate greenhouse gasses under the general phrase 'air pollutant' even though, when Congress passed the Clean Air Act, the notion that burning fossil fuels would lead to global warming was not known.  As the Court explained, "while the Congress that drafted [the Clear Air Act] might not have appreciated the possibility that burning fossil fuels could lead to global warming, they did understand that without regulatory flexibility, changing circumstances and scientific developments would soon render the Clean Air Act obsolete.  The broad language [of the operative section] reflects an intentional effort to confer the flexibility necessary to forestall such obsolescence." Id. at 532.

So too here.  In 2001, Congress adopted broad language in § 5330 to define a money transmitting business.  That broad language has allowed the Secretary of the Treasury to address

financial innovation that Congress could not have foreseen at the time. But the Secretary has addressed that financial innovation conservatively -- consistent with the text of § 5330 and the purposes that Congress identified in passing the law. In short, there was no agency overreach here.

The Secretary's regulations are an example of sound administrative agency practice – not a violation of the major-question doctrine caused by agency overreach. Thus, assuming the Court concludes that it is required to consider the validity of the Secretary's registration regulations for virtual currency transmitters, it should hold that these regulations are an appropriate exercise of agency authority and are therefore valid.

V.      CONCLUSION.

This Court should conclude that the indictment charging a violation of 18 U.S.C. § 1960(b)(1)(B) is valid because the facts alleged required the defendants to register their businesses under § 5330 or the regulation prescribed thereunder. Therefore, the Court should deny the defendants' motion to dismiss Counts One, Two and Three of the Superseding Indictment.

                                        Respectfully submitted,
                                        JANE E. YOUNG
                                        United States Attorney

Dated: August 23, 2022

                                        /s/ Seth R. Aframe
                                        Assistant U.S. Attorney
                                        MA Bar # 643288
                                        53 Pleasant Street, 4th Floor
                                        Concord, New Hampshire 03301
                                        603-225-1552
                                        seth.aframe@udoj.gov

                                        /s/ Georgiana L. MacDonald
                                        Assistant U.S. Attorney
                                        MA Bar # 685375
                                        53 Pleasant Street, 4th Floor

Concord, New Hampshire 03301
603-225-1552
georgiana.macdonald@usdoj.gov

/s/ John J. Kennedy
Assistant U.S. Attorney
NH Bar # 19557
53 Pleasant Street, 4th Floor
Concord, New Hampshire 03301
603-225-1552
john.kennedy2@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been forwarded via ECF electronic filing to all counsel of record.

/s/ Seth R. Aframe
Seth R. Aframe, AUSA