**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-30-2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   21-cr-41-01-JL
            v.                    *   21-cr-41-02-JL
                                  *   September 1, 2022
IAN FREEMAN AND ARIA DIMEZZO      *   9:45 a.m.
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:


For the Government:        Seth R. Aframe, AUSA
                           Georgiana MacDonald, AUSA
                           John J. Kennedy, AUSA
                           U.S. Attorney's Office




For the Defendants:

 (Ian Freeman)             Mark L. Sisti, Esq.
                           Sisti Law Offices


 (Aria DiMezzo)            Richard Guerriero, Esq.




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

```
 1                     P R O C E E D I N G S
 2              THE CLERK:  The Court is now in session and has
 3    before it for consideration a motion hearing in criminal case
 4    21-cr-41-JL, United States versus Ian Freeman, et al.
 5              THE COURT:  All right.  Good morning everybody.
 6              We're here on a motion to dismiss the latest
 7    indictment, which is the superseding indictment.  I have a
 8    copy of it right here which I've been reviewing with an eye
 9    toward this motion.  It's dated April 25th of this year.
10              I've read your submissions of course.
11              Mr. Sisti and Mr. Guerriero are here for the
12    defendants.
13              I've got three AUSAs here, AUSAs MacDonald,
14    Kennedy, and Aframe, for the prosecution.
15              All right.  It's your motion, defense.  I'm
16    listening.
17              MR. GUERRIERO:  Good morning, your Honor.
18              THE COURT:  Good morning.
19              MR. GUERRIERO:  My expectation is mostly that the
20    Court would have a lot of questions, but I do think I can
21    summarize our argument fairly succinctly.
22              THE COURT:  I do think I understand it.  I really
23    do.  I probably won't have that many questions, but I get it.
24              Go ahead.
25              MR. GUERRIERO:  Okay.  I mean, at the outset that's
```

1    what I'm -- I don't need to make a formal presentation.  I'm

2    happy to have a question at any time.

3            Our argument is fairly simple.  Our position is

4    that Congress has not authorized any federal agency to require

5    the registration of money transmitting businesses that are

6    involved in the exchange of virtual currency or fiat currency,

7    and that argument is based on the statutory history.  And,

8    most importantly, and this is really sort of the crux of our

9    case, most importantly on the recent U.S. Supreme Court

10   decision in West Virginia versus EPA.

11           I mean, frankly, I think that we're on the leading

12   edge of something here because that case really was a sea

13   change and makes a lot of the cases that came before it,

14   especially district court cases dealing with Chevron and those

15   sort of issues, I think it undermines a lot of those cases,

16   and even in the U.S. Supreme Court we have to follow that.

17           THE COURT:  I think that's fair.

18           MR. GUERRIERO:  So our argument, as I said, is that

19   this statute was enacted in 2001 before virtual currency

20   bitcoin was ever invented.  Seven years before it.

21           So after that -- or in that statute there is one

22   word which the government clings to, the word funds, and they

23   say that because the statute authorizes the Secretary of the

24   Treasury and FinCEN to require a licensing of money

25   transmitters, that funds should be read to include that.

1          Our position is not based on the definition of the

2     word funds.  As we said in our motion, many courts have found

3     that the word funds can be interpreted to include virtual

4     currency.  That's not our point any more than it was the point

5     in Utility Air, as explained in the Utility Air case, as

6     explained by the Supreme Court in the West Virginia case that

7     someone could argue that greenhouse gases fall within the

8     scope of the word pollutant.  Of course it does, and that's

9     why the West Virginia case says -- the point is not whether

10    there is a plausible basis in the text of the statute.  The

11    point is whether Congress clearly authorized a federal agency

12    to regulate a big, new, socially important part of the

13    economy.  And what we tried to demonstrate in our motion is

14    that virtual currency is exactly that, and that the major

15    questions doctrine recently described by the Supreme Court, I

16    think it's for the culmination of a whole line of cases, that

17    under that doctrine this is such an area, and, therefore, it

18    was wrong for FinCEN and the Department of Treasury to have

19    this requirement.

20          That's our argument in a nutshell.

21          THE COURT:  Okay.  But can't the government's case

22    proceed without -- let's assume you're right about that.

23    Let's assume that you're right about the idea that -- does it

24    matter if the statute itself authorizes the registration of

25    this activity?

1              MR. GUERRIERO:  Right.  And that's the first --

2              THE COURT:  It doesn't really matter what FinCEN

3    says, right?

4              MR. GUERRIERO:  I think it does, and here's why.

5              First of all, an interesting, just sort of a

6    preliminary point, but in the government's first argument they

7    take great pains to emphasize that the word or is used in the

8    statute, but actually in the superseding indictment in this

9    case they refer to a violation of the requirement and they say

10   and the statute and the regulations.

11             THE COURT:  They do.

12             MR. GUERRIERO:  And there's a good reason for that.

13   Because Congress doesn't enforce any statute.  The statute has

14   no meaning without regulation, and that is exactly why this

15   same statute says the Secretary of Treasury shall pass

16   regulations implementing this statute.

17             Another way to think about it is --

18             THE COURT:  Yeah, but the agency that is enforcing

19   the statute now isn't the Treasury.  It's DOJ.

20             MR. GUERRIERO:  Well, it's FinCEN which I --

21             THE COURT:  DOJ is.  DOJ is the one in court

22   enforcing the statute.  That's my point.

23             MR. GUERRIERO:  Okay.  All right.

24             THE COURT:  And aren't they able to interpret the

25   statute reasonably?  I mean, look, that's my point.  Does it

1    really matter what FinCEN does?  If the DOJ says the statute

2    requires this registration and views this conduct as violating

3    the law, what difference does it make what FinCEN says about

4    it?

5              MR. GUERRIERO:  Well, because FinCEN decides who's

6    within the scope of this and according to their own guidance,

7    and in fact that's what the indictment says.  FinCEN is -- you

8    know, the failure to --

9              THE COURT:  Where does the indictment say that?

10             MR. GUERRIERO:  Excuse me again?

11             THE COURT:  Where does the indictment say that,

12   that FinCEN decides who comes under the statute?  I don't read

13   the indictment that way.

14             MR. GUERRIERO:  Well, the indictment doesn't say

15   that.  The indictment says failure to comply with the statute

16   and the regulations, which I think they should say because the

17   statute says the Department of Treasury shall adopt these

18   regulations.

19             THE COURT:  Well, looking at Count 1, right?

20             MR. GUERRIERO:  Yep.

21             THE COURT:  Look at Count 1, paragraph 12.  It says

22   that Freeman, DiMezzo, and others unlawfully, wilfully, and

23   knowingly violated federal law in violation of a statute.

24             Now it says in the next paragraph it was part of

25   the object of the conspiracy, and it describes the conduct as

1　failure to comply with money transmitting business regulations

2　set forth in the statute and the regs, right?

3　　　　　MR. GUERRIERO:  Right.  Well, one way to look at it

4　is this.  There's only one registration required.  Like, if I

5　came in and said I registered per the statute so I ignored the

6　CFRs, that wouldn't make any sense because the -- I mean, and

7　if you think about -- I mean, it really almost goes to the

8　constitutional basis of how these things work.

9　　　　　Congress passes a law, the Executive Branch

10　enforces it, and the only way for it to make any sense is to

11　say, well, the statute is implemented by these regulations and

12　then the enforcement, the execution of it.

13　　　　　THE COURT:  Well, yeah, but statutes authorize

14　agencies to enforce them and implement them and all that, but

15　this isn't a civil case, like, brought by FinCEN.  This isn't

16　some -- you're not before FinCEN.  You're not before the

17　Treasury.  You're before the district court on an indictment

18　brought by DOJ.

19　　　　　They also have to interpret law, and their

20　interpretation is this conduct violates the law and they got a

21　grand jury to agree.

22　　　　　MR. GUERRIERO:  Well, I think their allegation is

23　you failed to register as required by FinCEN, and that is what

24　the law says.  The law says the Treasury Department shall pass

25　regulations to govern who regulates and how.

1              I mean, an example of it is the statute also I

2    think -- as for certain agents, it authorizes FinCEN to set a

3    cut-off point.  So it's clearly -- the statute delegates the

4    authority to FinCEN or to the Department of Treasury --

5              THE COURT:  No disagreement.

6              MR. GUERRIERO:  -- to determine the scope, okay?

7              THE COURT:  Well, yeah, but to determine the scope

8    where the statute is ambiguous.  I mean, that's the way it

9    works.  That's the Chevron doctrine.  Chevron hasn't been

10   overruled.  It's been supplanted by the major case doctrine,

11   right?

12             MR. GUERRIERO:  Right.

13             THE COURT:  The major case and questions doctrine,

14   but that's a doctrine of statutory interpretation.  I mean,

15   that's what that is as far as I've ever known.

16             I admit West Virginia does kind of push it to a new

17   level, I'm not disagreeing, but up till then every case I had

18   ever read that was a major case doctrine was sort of a we

19   decline to apply Chevron because this is such a major social

20   and political question that we, the Court, need to interpret

21   the statute.

22             MR. GUERRIERO:  Exactly.

23             THE COURT:  Okay.  Let me get to the nub of it.

24             MR. GUERRIERO:  Okay.

25             THE COURT:  So can't I say Richard's right --

1    Guerriero is right, this is a major case doctrine type of

2    question, I'm not going to defer to FinCEN's interpretation of

3    the statute, but I read the statute and I read the word funds,

4    and I think it applies to bitcoin?  See, that's the way the

5    major case doctrine works.

6            Now, the Court of Appeals might disagree, the

7    Supreme Court might disagree, but the major case doctrine

8    doesn't say case dismissed.  It says don't defer to FinCEN on

9    the meaning of the statute.  And under these doctrines as I

10   have always understood them, the only time you rely -- the

11   only time Congress is deemed to have delegated, unless it's an

12   express delegation, right, is if the statute is ambiguous, and

13   is this ambiguous?  I don't think so.

14           MR. GUERRIERO:  I think you're half right, your

15   Honor.  And, respectfully, the point at which I think that the

16   Court is incorrect is in saying that -- the Court is in a

17   position of determining what this word means in the statute.

18   That's not the question.  The question is did Congress

19   expressly authorize regulation in this major, new, different,

20   socially important area.

21           I mean, look, I'll just be frank with the Court.

22   If the Chevron doctrine applies, if the normal rules of

23   statutory interpretation apply, we lose, okay?  I grant that.

24           And what we're saying is that those rules do not

25   apply for exactly the reasons set forth in the West Virginia

1    case, and the question is not is there a plausible textual

2    basis, because that's what you were just describing.  The

3    Court found a plausible textual basis.  <u>West Virginia</u> says,

4    no, that is not the test.  We often found a plausible textual

5    basis.

6            The question is not just what did Congress intend,

7    but because this is such a big area and because it's so

8    important, did Congress actually intend to authorize

9    regulation in this area, and that's our argument.

10           THE COURT:  I don't know.  I think Congress clearly

11   did intend.  The question is whether -- see, what you're

12   telling me is this isn't a question of statutory

13   interpretation, this is a question of executive branch

14   authority, right?  Your point is there's been no delegation to

15   regulate bitcoin.

16           MR. GUERRIERO:  No, clearly --

17           THE COURT:  At least not until the 2021 amendments,

18   right?

19           MR. GUERRIERO:  Right.

20           THE COURT:  Now, I admit that the indictment here

21   does make this a little more complicated because it keeps

22   invoking the regs, and I'll have some questions to the

23   prosecutors about that, what that means for jury instructions

24   and evidence and all of that, but -- yeah.

25           But you're asking me to apply the major case

1    doctrine in a way that I don't ever -- like, for example, in a

2    criminal context, and in ways I've never seen it applied.

3    I've always seen the major case doctrine applied -- it's not

4    like it's applied every day.  It's a kind of marginal doctrine

5    of statutory interpretation until and maybe if West Virginia

6    made it more.  I get it.

7              MR. GUERRIERO:  That is my point.

8              THE COURT:  I know.

9              MR. GUERRIERO:  And our point is that -- I mean,

10   these particular counts -- not the fraud related counts, the

11   money laundering counts, but these particular counts, these

12   are regulatory offenses.  I mean, I think even the government

13   would describe it that way.  I think that they're regulatory

14   offenses.  They're a failure to get a license to engage in a

15   particular business.

16             THE COURT:  All offenses are regulatory offenses

17   really, aren't they?

18             MR. GUERRIERO:  Well --

19             THE COURT:  I mean, let me ask you this way.

20   Suppose these prosecutors here superseded again, all right?

21   Pick a Wednesday.  They go into the grand jury.  They come out

22   with a brand-new indictment.  It looks exactly the same, but

23   there's no reference to the regulations.  Do you still have

24   the same motion?

25             MR. GUERRIERO:  Yes.  Yes, we have the same motion

1    because I don't think you can read the -- you can't ignore the

2    part of the statute that says that the Secretary of the

3    Treasury shall adopt regulations enforcing this statute.

4            I mean, again, think of it this way.  I couldn't

5    say, oh, I didn't register with FinCEN.  I just looked at the

6    statute and made up my own registration and mailed it into the

7    Treasury.  I mean, you would be --

8            THE COURT:  Well, but you could say I read the

9    statute -- actually, you could.  You could say I registered

10   with the Treasury based on the statutory language.  Why

11   couldn't you?

12           MR. GUERRIERO:  Because the statute says

13   this statute -- it doesn't say the word implemented, but it

14   says the Secretary of Treasury shall provide regulations for

15   the enforcement of this statute, and it's clearly what was

16   intended.

17           As I say, I mean, until we filed this motion it was

18   even how the government read it.  I mean, it was clearly

19   everybody -- a reasonable reading of the statute is you pass

20   the statute and you have regs that enforce it, and that's how

21   it works in every other instance.  I mean, I can't think of

22   another instance where a business would say we're going to

23   ignore the regs and we're just going to comply with the

24   statute.  I mean, I don't think the government cited --

25           THE COURT:  You could comply with the regs by

1   complying with the statute.  That's the point.

2          Generally delegations that aren't -- you know,

3   pre-2021 if the -- you know, you can look at 2021 as changing

4   the law adding bitcoin or adding virtual currency, right, to

5   the regulatory scheme, but you can also read it as clarifying

6   the law.  Like it wasn't clear and we want to make it clear.

7   But it already did regulate virtual currency and bitcoin by

8   its clear statutory language based on the word funds.  You

9   could interpret it that way.

10          The point is the way this works -- my understanding

11   is when Congress has -- like the Chevron doctrine.  When

12   Congress has ambiguously expressed something with ambiguity in

13   an area regulated by the executive agency, that's an implicit

14   delegation of authority to the agency to interpret and enforce

15   the statute.

16          The way they do that -- what a regulation really

17   is -- what a rule really is is a refinement, an interpretation

18   of a statute.  That's all good, but that delegation only

19   happens when a statute is ambiguous.  And if it's not

20   ambiguous and the statute is clear, there's been no such

21   delegation and this Court doesn't have to defer to the

22   agency's interpretation.

23          The fact that this agency interpreted it as

24   applying to bitcoin pre-amendment is interesting, but I don't

25   have to defer to it.  I can not defer to it.  I can interpret

1      the law and say it applied to bitcoin.

2              You're saying I can't do that because of the major

3      cases.

4              MR. GUERRIERO:  That's right.

5              THE COURT:  I don't know if that's true or not.  I

6      don't think it is, but I don't know.  It certainly isn't

7      something they're creating precedent for.  I mean, specific

8      precedent for, you know.

9              MR. GUERRIERO:  Right.  I mean, neither side has a

10     post Virginia versus EPA case dealing with this kind of issue.

11             THE COURT:  True.  The burden is on you in this

12     situation, though, don't you think?

13             MR. GUERRIERO:  Excuse me?

14             THE COURT:  Isn't the burden on you in this

15     situation?  I mean, you're citing West Virginia for a fairly

16     novel proposition of law, that a criminal indictment has to be

17     dismissed because FinCEN/Treasury has exceed its authority in

18     regulating bitcoin or at least had before the 2021 amendments.

19     That's your argument.

20             MR. GUERRIERO:  Well, I mean, I guess -- I don't

21     have this in my motion, but your question makes me think of a

22     hypothetical.

23             What if one of the coal-powered plants that was at

24     issue and suppose one of them said -- this is kind of more of

25     a hypothetical than the facts of the case, but what if some

1   coal-powered plant said, you know, we're not going to

2   subsidize some other industry and we're not going to reduce

3   our production, and we're putting it in our notes that

4   everybody can see later that we're going to do that in a

5   knowing way.  I would think that would probably at some point

6   be criminal conduct, and in that case that coal-powered plant

7   would have exactly the same kind of motion that we have here.

8   That there was never any authority to impose that requirement,

9   that regulation.

10          I mean EPA -- there are many environmental

11   situations where -- and I've been co-counsel, civil counsel,

12   in many cases where an environmental case comes close to being

13   a criminal case.  Because if there's some sort of knowing

14   pollution, knowing violation, knowing skirting of the

15   standards, it becomes a criminal case.

16          So I think in that hypothetical they would have

17   exactly the same argument that we have here.

18          And if I can just go back to one of your Honor's

19   other points?

20          THE COURT:  Of course.

21          MR. GUERRIERO:  In terms of ambiguity of the

22   statute in this area, in this kind of major area, as I said --

23   and I think the government acknowledges this implicitly.  They

24   say that this is a big, new thing, and then they still try to

25   include it within funds.

1            But, I mean, think of it this way.  Before five or

2    six years ago, like, nobody knew anything about virtual

3    currency.  Like, you could buy a pizza for one bitcoin.  And

4    now it's this multi trillion-dollar industry that's advertised

5    during the Super Bowl.  I mean, it's a huge change.  And so to

6    say it's not the kind of major questions area just doesn't fit

7    with the facts.

8            THE COURT:  That's the thing about the major

9    questions doctrine, though, not to be critical of our Supreme

10   Court, but, you know, a lot of things can be thought of as

11   major questions.

12           You know, my first exposure to the whole doctrine

13   was the King v. Burwell case on Obama Care.  I should call it

14   the Affordable Care Act, right?  But there was really no

15   question that was a major political social question.

16           I'm not saying this isn't.  I'm not.  But, see,

17   again -- here's I think our disagreement.  It's not that I

18   have a problem with the idea that this is a major question.  I

19   don't even know because, like, what passes for a major

20   question is by no means clear under the law yet.  But if I

21   agree with you that it is, all that says to me the way I

22   understand the major case doctrine is that it means I don't

23   defer to FinCEN in interpreting the criminal statute.  That's

24   what it means.  It means when I look at funds, I don't have to

25   go to FinCEN to say does funds include bitcoin.  Yes, it does

1    according to FinCEN.  I don't have to do that.  I can tell it

2    from the statute.  So I don't defer.  And it's up to the Court

3    to interpret the statute.  To me it's a doctrine of statutory

4    interpretation.  To you it's a doctrine of executive

5    authority, and I don't think those things have to be, those

6    two ideas have to be contradictory.  Because to me even if

7    it's a doctrine of executive authority, it's an executive

8    agency's authority to interpret its enabling legislation.

9    Like, I'm allowed to be -- we, as an agency, are allowed to be

10   in this area doing this work.

11          And that's why I asked you, well, let's suppose

12   there was no regs, could this prosecution still be underway if

13   these regs didn't exist, if we struck this language from the

14   indictment.  My sense is that it could, but, yeah.

15          MR. GUERRIERO:  I mean, my objection would be no

16   process for licensing was ever prescribed by the Secretary of

17   Treasury as commanded by Congress.  Therefore, there was no

18   requirement for somebody to register.  I mean, without the

19   regs, the statute is not implemented.

20          THE COURT:  Yeah, I think that -- to the extent

21   that that has validity, I think it applies to different counts

22   of the indictment differently.  As I read these counts, some

23   more or less include regulatory authority than others.

24          MR. GUERRIERO:  Your Honor, I want to make sure I'm

25   clear on this point.

1           THE COURT:  Yeah.

2           MR. GUERRIERO:  In terms of the Court having the

3   authority to interpret the statute and the question being the

4   interpretation of the statute, that's just not what the West

5   Virginia case says.  I mean, the exact words are not merely

6   plausible textual basis for agency action.  There has to be,

7   "clear congressional authorization."

8           Now, you might find, I suppose, that the use of one

9   word, funds, written seven years before bitcoin was ever

10  invented was clear congressional authorization.

11          THE COURT:  See, I think of the Bostock case now.

12  Remember that Bostock case under Title VII, the case a couple

13  of years ago where the Supreme Court said workplace

14  discrimination against same sex relationships, right, against

15  sexual orientation call it, right, or sexual identity, and the

16  Supreme Court said, yeah, that's been unlawful since 1964.

17  That's what the word sex means.  Sex has been --

18  discrimination on the basis of sex has been unlawful.

19  Regardless of whether the EEOC figured it out, the agency to

20  implement it figured it out for many years, you know, Gorsuch

21  and the majority said sex means sexual orientation.  Sex means

22  sexual identity.  That's just what it means.

23          And so Justice Alito's point that, no, nobody

24  intended that, everybody agreed nobody intended that in 1964,

25  didn't matter because the words meant what they meant

1  according to the majority.

2        This is the same situation, right?  If funds means

3  bitcoin, even if bitcoin wasn't on anybody's mind at the time,

4  it means bitcoin.

5        MR. GUERRIERO:  I guess I would disagree with that

6  because I don't see how the Court could find clear

7  congressional authorization if it didn't exist at the time.  I

8  mean, this is a different thing.

9        THE COURT:  Yeah.  Different because of course

10  sexual orientation existed at the time, yeah.

11        MR. GUERRIERO:  Right.  I mean, this -- you know, I

12  mean, the government and everyone refers to bitcoin as virtual

13  currency, but if you --

14        THE COURT:  Certain firearms that didn't exist at

15  the time of the Second Amendment, right, and yet --

16        MR. GUERRIERO:  Well, but this is -- this is really

17  a different thing.  Remember that it's not backed by any

18  government.  It doesn't have any intrinsic value.  It is a

19  thing that exists only on the Internet, you know, and so to

20  say that it's something that Congress was thinking about or

21  intended in 2001, it just -- I mean, the most that I think the

22  government can say is that, well, Congress was looking forward

23  to every possible kind of thing.  But if that was true, then

24  why did Congress add this language in 2020 of --

25        THE COURT:  It only means Congress is looking

1     forward to funds.  That's all it means.  It doesn't mean every

2     possible kind of thing.

3            I mean, I understand your point, it exists only on

4     the Internet, but I don't think the fact that it exists only

5     on the Internet makes it any less real than greenbacks.  I

6     think your clients would agree with that.  It's real.

7            The point is it's not backed by any government,

8     that's true, but -- I don't know.  I haven't done a deep dive

9     on this, but in our country's history there were many types of

10    currencies.  Some were issued by the colonies and the states,

11    the early states, right?  Some were issued by the federal

12    government.  Some were issued by banks.  That's actually --

13            MR. GUERRIERO:  Well, that's an important

14    distinction because virtual currency -- I'm sorry.  I didn't

15    mean to interrupt.

16            THE COURT:  I'll just finish the point briefly.

17            Some were issued only by private institutions and

18    entities, yet my sense is they were still regulated by laws.

19            MR. GUERRIERO:  I believe they were.

20            THE COURT:  By state and federal laws.

21            So the fact that bitcoin didn't exist at the time

22    of the original enactment -- let me just say this.  It's not

23    that your arguments don't make sense to me.  It's just that

24    you're asking me to take the major case and questions doctrine

25    and apply it in a way that I'm not sure I can apply it.

1          MR. GUERRIERO:  I think your Honor's point is

2     incorrect for exactly one of the main reasons that bitcoin

3     exists.  Every example you gave involves the two people to the

4     transaction and a third party, the government, a bank, someone

5     issuing the funds.  There is no third party in virtual

6     currency.

7          THE COURT:  But there was no third party when banks

8     and financial institutions in the early times of the republic

9     were issuing money.  They were doing it all the time.

10          MR. GUERRIERO:  The bank is a third party.

11          So, like, if you say -- like, suppose in the time

12     before there was a bank issuing -- before the government was

13     issuing any currency and you just had a bank note, you know,

14     like in a train robbery in the old movies and they just had

15     bank notes.  So if someone said I'm going to be a money

16     transmitter or a money exchanger for that, like, there is the

17     person doing the transmitting, there is the person that wants

18     the money transmitted, and then there's the bank that has

19     issued the note, the third party.

20          With virtual currency, with bitcoin, there is no

21     third party.  The interaction is between the person doing --

22     you know, the people doing the exchange.  There's not a third

23     party in --

24          THE COURT:  So this may be something I didn't --

25     I'm not sure how much this matters for our conversation, to be

1    honest, but now I'm just learning a little bit.

2              So in a bitcoin transaction the bitcoin itself is

3    literally created by the two parties in the transaction?  I

4    don't think so.  I don't.  Is that the case?

5              MR. GUERRIERO:  It exists on the Internet.  I mean,

6    and so it's -- I mean, I know that it's --

7              THE COURT:  You think that's a fantasy and a

8    phantom.  I think that's real.

9              MR. GUERRIERO:  Yep.

10             THE COURT:  I don't know why you're so old, but I'm

11   part of 2022 and I realize things on the Internet, they exist,

12   right?  I mean, that's not -- it's no less real.  It's no less

13   real because it's not paper or instrumentalized by a document,

14   is it?

15             MR. GUERRIERO:  No.  There's no -- it can be.

16             THE COURT:  So there is a third party.  Somebody

17   who's creating that environment for it to exist.  There's got

18   to be a way to express that the bitcoin exists independent of

19   the transaction between the two parties.

20             MR. GUERRIERO:  It is.  It's the blockchain on the

21   Internet.

22             THE COURT:  There you go.

23             MR. GUERRIERO:  It's the process that's on the

24   Internet.  That's where it exists.  And the blockchain is not

25   a party to anything, And that was the whole point.  I mean,

1  the reason that people wanted virtual currency was to be free

2  of government.

3            THE COURT:  Free, yeah.

4            MR. GUERRIERO:  That's the whole point.

5            THE COURT:  Understood.

6            MR. GUERRIERO:  Okay.  I think I covered most of my

7  points.

8            THE COURT:  I think you have, too.

9            It's not a -- I'm not trying to say it's, you know,

10  illogical or, like, you know, a crazy argument.  I'm just not

11  sure I'm prepared to dismiss a criminal indictment based on

12  it.

13            But I have some questions for the prosecution, and

14  maybe their answers will help me get there.

15            MR. GUERRIERO:  Thank you, your Honor.

16            THE COURT:  Help me get to discussing their

17  indictment, yeah.  I'm not sure that's where they want to go.

18            Here's the thing.

19            MR. AFRAME:  Yes.

20            THE COURT:  You did cite the regs in the

21  indictment.

22            MR. AFRAME:  Yes, because those are --

23            THE COURT:  Because -- tell me.

24            MR. AFRAME:  Because we allege in the conjunctive.

25  We've proven the disjunctive.  The statute says you can

1    violate the law -- in 1960 says you can violate the law in two

2    ways.  You can violate it by violating the registration

3    requirement under 5330 or the regulations prescribed

4    thereunder.

5          So the right way to indict that is with the word

6    and.  The right way to prove that is with the word or.

7          THE COURT:  It's always been a weird thing about

8    indictments.

9          MR. AFRAME:  But it is --

10          THE COURT:  They allege in the conjunctive but you

11    can prove in the disjunctive.

12          MR. AFRAME:  And we will prove it in the or because

13    here I think, as I tried to lay out as clearly as I could, the

14    plain language of 5330 captures bitcoin.  But if it didn't and

15    the words were ambiguous and a regulation was prescribed that

16    said we take this ambiguous word funds and say it includes

17    bitcoin, then that, too, would be an alternative way to prove

18    it.

19          My point in my memo was we don't have to get to the

20    regulations because every Court, minus one magistrate judge's

21    opinion, has said that the word funds as used in 5330 in 1960

22    means bitcoin plainly.

23          And so whether FinCEN said it or not I think

24    doesn't matter, but it has said it and you could prove it

25    either way.

1            THE COURT:  Let me ask you this question.  So

2    suppose -- how would you feel about the proposition that I

3    don't dismiss this indictment but I also don't want to buy

4    that issue on appeal?  I don't instruct the jury on the regs.

5    Like, for example, do you plan to call a witness on the regs?

6            MR. AFRAME:  We are prepared to.

7            THE COURT:  Do you plan to?  Because that's the

8    question.  This could eliminate the issue by not talking about

9    the regs.

10            MR. AFRAME:  So, I mean, I'll say -- I haven't

11    finalized them.  I've written draft jury instructions.  I

12    didn't talk about the regs because my view is that we get

13    there -- and I tried to do that in this brief as succinctly as

14    I could.  We can get there and I think I got there without

15    mentioning the regs.

16            THE COURT:  Yeah, I get it.

17            MR. AFRAME:  And that does -- as Mr. Guerriero

18    points out, that presupposes you conclude that the word funds

19    includes bitcoin.  But if it does, then you can follow the

20    chain from 1960(b)(1)(B) to 1530 to 5313 to 5312, and it all

21    uses the same word funds.  And so I think the registration

22    requirement is established by statute.

23            THE COURT:  Yeah, I mean, I certainly think the

24    statute can be read to establish it.  That's for sure.

25            Do you -- but you're not at this point -- at least

1    for the purposes of this hearing you're not at the point where

2    you're saying the Court could basically -- I don't want to use

3    the word strike from the indictment because I don't want to

4    undermine the grand jury's indictment, but just, I don't know,

5    instruct the case based on statutory language without getting

6    into the regs.

7            MR. AFRAME:  Yes.  Honestly, I mean, they may

8    object to this later, I don't know, something I think is

9    important about a FinCEN witness is not this.  It's sort of

10   what does registration require one to do and what was not done

11   here that may be relevant to other parts of the case.

12           THE COURT:  Uh-huh.

13           MR. AFRAME:  Like, you know, suspicious activity

14   reports, other BSA requirements that do connect to

15   registration but then I think connect to our money laundering,

16   you know, willful blindness idea that, you know, there was

17   money laundering here.  And none of these things that one

18   might do to know what's going on in the transactions were

19   done, and it might be relevant to prove what those are.  I

20   don't think that gets to the 1960 count.  I think you get to

21   the 1960 count through the statute.

22           THE COURT:  Let me ask you some questions about the

23   West Virginia case then.

24           MR. AFRAME:  Yes.

25           THE COURT:  Because I don't think Mr. Guerriero is

1    incorrect when he says -- there is something about the West
2    Virginia opinion that -- there's something about the West
3    Virginia opinion that feels like it's treating the major case
4    doctrine as more than a doctrine of statutory interpretation.
5            MR. AFRAME:  Well, I don't think it says that
6    because I think it specifically says if -- as I understand it,
7    if we have what appears to be to the Court on its looking at
8    what's gone on a remedial overreach by the agency, if it feels
9    like a remedial overreach by the agency, we're not going to
10   rely on colorable statutory construction.  We're going to
11   require a clear statement.  That's a rule of statutory
12   construction.  If we feel like the remedial measures taken by
13   the agency are having a major affect on the U.S. economy, we
14   will not presume that merely colorable language is enough.  We
15   will demand a clear statement by Congress.
16           My understanding is that's a rule of statutory
17   construction.  In those circumstances we require a clear
18   statement where otherwise ambiguity would be enough.
19           My point on the major questions doctrine is there
20   is no remedial overreach here.  I mean, now we're past my
21   first argument.  You would have to say the statute is not
22   clear.  Now the government can't rely on the statute.  It
23   needs the regulations to prove its case.
24           And now the government -- and now the question
25   would be, well, can the agency reasonably conclude that funds

1      includes bitcoin.

2                    THE COURT:  Yeah.

3                    MR. AFRAME:  And what would make it a major

4      questions doctrine -- if having made that sort of initial,

5      yes, we can cover bitcoin, I think it becomes the major

6      questions doctrine if the agency then does something

7      extraordinary with that determination, like put the coal

8      business -- try to put the coal business out of business.  Try

9      to eliminate tobacco in the United States.  Make every worker

10     get a vaccination or a test every week.

11                   THE COURT:  So you're analogizing it with the West

12     Virginia scenario now, right?

13                   MR. AFRAME:  Right.

14                   THE COURT:  Okay.

15                   MR. AFRAME:  They did something extraordinary.

16                   And my point here is they did nothing

17     extraordinary.  They literally said virtual currency is

18     covered just like fiat currency.  What we make fiat currency

19     do is file a registration.  What are we going to do with

20     virtual currency?  File a registration.  It's exactly the same

21     remedy.

22                   I think the major questions doctrine is about

23     extraordinary remedies, and that's why I brought you to the

24     Massachusetts versus EPA case in my papers where -- what the

25     Court said there is, you know, sometimes, you know, Congress

1    uses broad words.  Then that allows -- why does Congress do

2    that?  Because it can't foresee everything, and then the

3    agency gets to decide.

4         The overlay of West Virginia is if once they decide

5    they then do something like try to put the coal business out

6    of business in the United States, that gives us concern.

7         And I don't see that here.  I see the agency doing

8    what it did for fiat currency, it did for virtual currency.

9    No agency overreach.  No major question.

10        THE COURT:  That sounds to me like you're saying

11   then that you continue to view the major case doctrine -- the

12   major case and questions doctrine as a doctrine of statutory

13   interpretation.

14        MR. AFRAME:  Yes.  Because maybe the agency can do

15   something extraordinary like that.  But if it's going to have

16   that power, if the Court is going to say it has that power,

17   it's going to look for a clear statement by Congress and not

18   rely on what Justice Roberts calls colorable language, which

19   is not a clear statement.

20        THE COURT:  And Mr. Guerriero is calling plausible,

21   yeah.

22        MR. AFRAME:  Yeah.

23        THE COURT:  Which I don't think is an issue here.

24   I just don't.  It's not like it's whether it's plausible.  I

25   don't think it's a tough interpretive question.

1           MR. AFRAME:  No.

2           THE COURT:  All right.  I think you've got to be

3   prepared for the fact that if I deny this motion, I might be

4   pretty stingy with the regulatory talk at trial.

5           Now, you're telling me you don't even have it in

6   your jury instructions.  So that's a big issue off the table,

7   but this could come up.  I just want you to be aware of that.

8           MR. AFRAME:  Yeah, I mean, I think at the

9   appropriate time, which I don't think is today, we would argue

10  about what's the purpose of putting that on, but I don't

11  intend to put it on to say, oh, here's our proof that they

12  have to register.  I mean, I think we get to that element of

13  the offense without it.  I don't think -- I mean, the 1960

14  offense is a pretty easy offense to prove.  They don't have to

15  know they had to register.  They just have to know they didn't

16  register and they have to be running the business.

17          THE COURT:  Does it matter that you say in the

18  19 -- well, let me see.  Yeah, in the conspiracy, the 1960

19  conspiracy, yeah, you allege that their conduct violated the

20  statute but it was an object of the conspiracy to fail to

21  comply with the regs.

22          Does that matter?  And if so, why or why not?  And

23  tell me why not.  You might want to pull it out.  I'm looking

24  at paragraphs 12 and 13, right?

25          Paragraph 12 you say they conspired to violate

1    1960, but in paragraph 13 you say it's a part and object of

2    the conspiracy that Freeman and DiMezzo --

3              MR. AFRAME:  Yeah, I see it.

4              THE COURT:  Okay.

5              MR. AFRAME:  So all we did there is quote the

6    statutory language with the "and".  I mean, I think we're back

7    to the same --

8              THE COURT:  And that and's makes it disjunctive so

9    you can go with one or the other.

10             MR. AFRAME:  Right.  The only difference in this

11   statutory language is making the "or" "and".  I guess I've

12   already explained why we did that.

13             THE COURT:  Yes.

14             MR. AFRAME:  So, you know, I think we can prove you

15   can allege -- I mean, I don't think this is a multi-object

16   conspiracy.  I just think we're saying that these requirements

17   can come from one of two sources.  And I think that's true,

18   they can come from one of two sources, but we only have to

19   prove one of them.

20             THE COURT:  One of them.  In your overt acts you

21   don't cite the regs at all.

22             MR. AFRAME:  No.  These are things they did to run

23   the business.

24             THE COURT:  Count 2 you don't cite the regs at all.

25             Count 3 you do cite the regs.

```
 1                    MR. AFRAME:  Count 2 is the same.  We say -- in
 2     paragraph 17 we say under Section 5333 and regulations
 3     prescribed thereunder.
 4                    THE COURT:  Oh, wait a minute.  I must have
 5     overlooked that.  Count 2 --
 6                    MR. AFRAME:  Five lines from the bottom of
 7     paragraph 17.
 8                    THE COURT:  Yes.  Thank you.
 9                    Okay.  Disjunctive proof.  And I guess that holds
10     throughout the document.  Okay.
11                    MR. AFRAME:  So, you know, I mean --
12                    THE COURT:  All right.  Anything else you want to
13     tell me?
14                    MR. AFRAME:  I don't think so.
15                    THE COURT:  Mr. Guerriero, do you want to respond?
16                    MR. GUERRIERO:  I want to reply on a couple of
17     points, your Honor.
18                    THE COURT:  Take your time.
19                    MR. GUERRIERO:  So the first thing that I would ask
20     the Court to do is look specifically at 5330(a)(2), and
21     5330(a)(1) is the requirement for registration.
22                    Immediately after that, 5330(a)(2), the Secretary
23     of Treasury shall prescribe by regulation the -- not one of
24     the kind of ways -- the form and manner for registering a
25     money transmitting business.
```

1      They're only talking about one kind of license or

2  registration.  It says the form and manner.

3      So to say that someone could register under the

4  statute and completely ignore the regs, that's contrary to

5  what the statute says.

6      THE COURT:  Yeah, but that's just -- to me that's

7  just like the agency has come up with a form you've got to

8  fill out, that's all that is, and what it applies to.  I'm

9  with you.

10      But remember he's saying he's not going to have to

11  prove that.  He can prove in the disjunctive.  He's saying I'm

12  prepared to go forward on the statute, not the reg.

13      See, I'm not disputing at all that Congress

14  authorized, well, post-amendment 2021 expressly authorized

15  this regulation of this currency, but I don't even think that

16  there's much of a question that it did so before and did so

17  reasonably.

18      But you don't have to get into whether it applied

19  to bitcoin before the 2021 amendments unless you think that

20  that delegation was in some way ambiguous.  That's the only

21  time you would have to decide -- that's the way the major case

22  doctrine works.  Look, you're citing one case, but it's not

23  the only case that talks about the major case doctrine.  It's

24  -- I think one way to look at it is, the way Mr. Aframe did,

25  was when the agency in its exercise of authority that was

1    delegated to it intrudes into an entirely unanticipated area

2    that, you know, rocks the foundations of our economy and

3    political system, well, that needs to be -- that needs to be

4    stricken.  That needs to be invalidated.

5            That's the thing.  I mean, I don't even know if

6    this qualifies, to be honest, as a major political and

7    economic question.  It's certainly important, but everything

8    is important or there wouldn't be federal legislation about

9    it.

10           It's different.  There's something different about

11   completely changing an entire industry.  Like, the entire

12   monetary system of the United States has not been undermined

13   by anything that FinCEN or the Treasury did vis-a-vis bitcoin,

14   has it?

15           MR. GUERRIERO:  Undermined may not be the word, but

16   has the entire financial system of the world been changed by

17   the advent of virtual currency?  Yes, it has.  Frankly, I

18   mean, it is literally a multi trillion-dollar segment of the

19   economy.

20           THE COURT:  No question.

21           MR. GUERRIERO:  I mean, like I said -- it's a

22   shocking amount of change in a short period of time.  I mean,

23   as I said, it was a novelty thing, you know, 12, 15 years ago

24   that only a few people were involved in, and now a single

25   bitcoin is worth tens of thousands of dollars.  And there's,

1  you know, like I said, advertisements on the Super Bowl.

2  Every major financial firm deals with it.  I mean, it is a

3  very large change.

4          And one of the reasons I put in my brief the market

5  capital valuation of the coal-powered electricity generation

6  part of the economy is this is a lot bigger than that, okay?

7  And even if the government says, well, we don't care about all

8  the virtual currency, we're only requiring some people to

9  register, I mean, this is, you know, many times over bigger.

10         So even if you say, well, only a percentage of the

11  people involved with bitcoin have to register, only a

12  percentage are actually doing transmitting and exchanging,

13  it's still a very large and impactful part of the economy

14  because they're servicing all those other people that are

15  owning bitcoin.  So I don't think the Court could correctly

16  find that it's not.

17         To go back to the questions you were asking

18  Attorney Aframe.

19         THE COURT:  Yep.

20         MR. GUERRIERO:  So what if this happens?  I mean,

21  you instruct the jury on the statute.  We ask you to include,

22  which I think we fairly could, the part of the statute that

23  says the Secretary of Treasury shall prescribe by regulation

24  the form and manner for registering a money transmitting

25  business.

1          THE COURT:  Doesn't he get to inject into the case

2     something you say is unlawful and then --

3          MR. GUERRIERO:  No.  I'm saying we want the jury to

4     know that we don't believe we violated the regulations, and

5     then the jury says what are the regs.

6          THE COURT:  Okay.  So if you make the regs part of

7     the case and the jury hears evidence on it, because I think

8     that would be fair, right, we don't think that these regs

9     required us to -- we don't think that these regs required

10    bitcoin to be registered.  We were trying to comply with the

11    law, right?  That's the -- okay.  What of it, though?  So what

12    of it?  I mean, so then what happens?

13         MR. GUERRIERO:  So then we're back to the issue of

14    whether or not these regulations are valid.

15         THE COURT:  So you would be saying we were trying

16    to rely on them, but they were invalid?

17         MR. GUERRIERO:  I'm sorry.  Can you say that again?

18         THE COURT:  You want to say as a defense, we were

19    trying to rely on the regs which we didn't think applied to

20    bitcoin, right?

21         MR. GUERRIERO:  No.  What I'm saying is that if the

22    allegation is that they failed to properly register, then we

23    should be able to request an instruction on the entire

24    statute.

25         THE COURT:  Okay.

1          MR. GUERRIERO:  And then the jury asks, well, what

2     are the regs.  I mean, would the Court instruct the jury there

3     are no valid regs as we want?  I don't think that you would do

4     that if you had decided with the government.

5          THE COURT:  I would instruct them on the applicable

6     law of the statute.  You're talking about a jury question,

7     like, during deliberations?

8          MR. GUERRIERO:  Sure.  Suppose you don't tell them

9     anything about the regs --

10         THE COURT:  This came up -- we had a case -- this

11    came up in the Suzanne Brown case, right, that, you know, I've

12    been dealing with for many years now, but the jury said -- the

13    jury asked a question that the regs answered, but nobody had

14    made the regs, at least knowingly made the regs part of the

15    record in the case.  We talked about, well, I could just tell

16    them the law about the regs.  I could do that.  And I think,

17    I'm trying to remember right, the defense didn't want to do

18    that.

19         What would you do?  If they asked the question,

20    what would you do?  Would you want me to just advise them -- I

21    don't think the prosecution would object to that.

22         So let's say I did that.  Would you agree that they

23    should hear about the regs if they asked that question?

24         MR. GUERRIERO:  If you had denied our motion and

25    were going to instruct the jury that the regs were lawful?

1          THE COURT:  No, no.  Here's what I'm envisioning,

2   okay?  I'm envisioning a trial that doesn't involve the regs

3   which is I think what your question assumes.  Your question

4   assumes they haven't heard anything about the regs, right?

5          MR. GUERRIERO:  Well, it's certainly our position

6   that the only registration requirement is the one imposed by

7   the Treasury Secretary -- or implemented by the Treasury

8   Secretary.  Because the statute says the form and manner for

9   registering a money transmitting business.

10          THE COURT:  Maybe I lost it through your question.

11   Let's try it one more time.  The jury has a question.  What is

12   it?

13          MR. GUERRIERO:  Okay.  The jury says you've read to

14   us the statute that makes a reference to the regulations.

15   What are the regulations?

16          THE COURT:  Oh.  I'm not going to read them a

17   statute.  I'm going to give them jury instructions.

18          MR. GUERRIERO:  And I guess our request would be,

19   well, they have to be instructed that the form and manner of

20   registration is the one prescribed by the Treasury.

21          THE COURT:  By the regulations.

22          MR. GUERRIERO:  And the regulation is invalid.

23          THE COURT:  So let me assume your -- yeah, I'll go

24   with your facts that they hear the statute that makes

25   reference to the regulations and they ask me what?  They're

1    deliberating.  The note comes out and it says what?

2              Mark is trying to get your attention.

3              (Attorney Guerriero and Attorney Sisti confer)

4              MR. GUERRIERO:  What co-counsel suggested, which I

5    think is a good question, is what if the jury question is was

6    this activity contrary to the regulations?

7              THE COURT:  Normally I think -- if there hadn't

8    been any evidence about that, the answer would normally be you

9    haven't heard any evidence or testimony about the regulations.

10   That's normally what you do in a situation like that, right?

11             But let's assume -- because, frankly, that was the

12   question that came out in that earlier trial I was talking

13   about, and we talked about answering it, right, if both sides

14   could agree on an answer.  That's the only way you could do

15   that.

16             Okay.  So the question comes out.  I think, you

17   know, and I can't commit to anything that's going to happen at

18   this trial yet because we're not there, but I would probably

19   instruct them that you've been instructed on the law and you

20   are to apply it to the facts, and you haven't heard anything

21   about those regulations.  That's not the charge.

22             Because unless they're going to try to prove that

23   up, there's no reason for the jury to be involved with asking

24   that question, and that would be the answer for them, but I

25   think I would try to -- if we had a trial that didn't involve

1    the regulations, okay, if the prosecution didn't make it an

2    issue, I would try to instruct the jury in a way that didn't

3    provoke that question.  I guess I'm kind of undercutting your

4    hypothetical.

5           But if it did come out, I would instruct them to

6    focus on the law as I've instructed them and the facts as

7    they've heard them.  That's what I think I would do.

8           Now, it sounds like you're saying -- okay.  So

9    let's just play it out, though, because maybe I'm not thinking

10   of something that you're envisioning.

11          The question comes out, did their filing comply

12   with the regulations.  What would your answer be?  What would

13   you propose I do with that?

14          MR. GUERRIERO:  I would propose that you dismiss

15   those counts at that point because what you had done is -- we

16   had said, well, we're not going to decide that issue because

17   we're going to just say that you can go on the basis of a

18   violation of a statute.  You had not decided the validity of

19   the regs.  Once they ask that question, then I don't think we

20   can go forward.

21          THE COURT:  For today though I don't think -- yeah,

22   that's a good point, but I think that that's the kind of

23   bridge I would have to cross when I came to it.

24          What I will decide today -- I want to take a little

25   recess because I want to think this through a little bit more,

1   but I'm not sure -- I think my view at this point is that the

2   major case doctrine isn't even implicated by this question

3   because it's not an ambiguous statute, and I view that as a

4   doctrine of statutory interpretation.

5           But even if I agreed with you, I'm not sure I agree

6   that the major case doctrine is even implicated even if it is,

7   as you say, not just a doctrine of statutory interpretation

8   but a doctrine of the scope of regulatory authority.

9           That's probably what I would do for today's

10  purposes, but I would maybe be in the position of having to

11  refine that and adjust that come trial time.  I get it, but I

12  don't think it's a trial derailer to the extent you do, like

13  requiring a dismissal or a mistrial.

14          Now I'll have you plotting and planning of course

15  for a while, but that's just where I sit right now I think,

16  you know.

17          Okay.  It's a good question and it could happen.  I

18  would try to instruct the jury in a way to prevent it from

19  happening.  I really would, you know.  We'll see.

20          All right.  Let me take a recess.

21          Anybody want to say anything else before -- Mr.

22  Sisti, you haven't spoken.

23          MR. SISTI:  No.  I mean -- I'm sorry.  I hate to

24  cut in.

25          THE COURT:  That's okay.

1          MR. SISTI:  But maybe it's the simple way I take a

2    look at things.

3          I think that what you're actually going to see --

4    the practical aspect of this case is that an indictment is

5    going to be read to the jury.  They're going to hear

6    regulation.

7          THE COURT:  This is you telling me you're going to

8    read the indictment to the jury?

9          MR. SISTI:  The indictment is out there.

10         THE COURT:  Well, it's out there, but they don't

11   usually read indictments.

12         MR. SISTI:  I'm going to tell them what my client

13   was charged with.  Why can't I tell them what my client was

14   charged with?

15         THE COURT:  I didn't say that.  I'm just asking you

16   how would they hear it and --

17         MR. SISTI:  And why wouldn't you take judicial

18   notice of it?  My client is sitting in this courtroom.  That

19   sheet of paper is what we're defending against.

20         THE COURT:  What brought him here.

21         MR. SISTI:  Yeah.  How are they then going to be

22   told, ignore the language, please ignore -- you know, please

23   ignore that behind the curtain?

24         THE COURT:  Well, actually, though, I think we've

25   both seen -- we've both seen in our careers prosecutors say

1     we're not arguing X.  We're only arguing Y.  We're not asking

2     you to convict him under variation X even though it's in the

3     indictment.  We've seen that.  Aren't they free to do that?

4             MR. SISTI:  They may be free to do that, but then

5     the next layer of analysis is did the grand jury return that

6     indictment based on the language within the four corners of

7     the indictment, and is my client on trial on the regulation.

8     The non-regulation, as we would put it.

9             THE COURT:  Well, let me try to make it simple like

10    you just did.  Let's talk about a gun possession case, right?

11    The indictment says he possessed the .38 and the .357 Magnum.

12    It's right there in the indictment, .38 and mag, right?

13            MR. SISTI:  Uh-huh.

14            THE COURT:  And the prosecutor stands up and just

15    says to them we're not asking you to convict him on the

16    Magnum.  We haven't presented enough evidence on the Magnum.

17    We're asking you to convict him on the .38.

18            They can do that.

19            MR. SISTI:  Well, that's one way of looking at it.

20    The other would be that he's on trial for the possession of a

21    controlled drug, a controlled drug, and you name three or four

22    of them.

23            THE COURT:  Right.  Meth, fentanyl, cocaine.

24            MR. SISTI:  Yeah.  What did the grand jury come

25    back with?  Were they told they only had to find one?

1      THE COURT:  I don't know what they were told

2  because we don't know what grand juries normally are told,

3  right, but if it says -- we know how to interpret indictments

4  though, and if it says meth and coke and fentanyl, the jury

5  can convict on any one of those.  Especially if the

6  prosecution disavows one of them or two of them and the jury

7  is only instructed, right?

8      That could happen here.  I'm not saying you

9  couldn't read the indictment to the jury, I'm really not,

10  because I think that's fair, but I'm not sure it meets the

11  problem.  It all depends, you're right, on how they are

12  instructed and what evidence they hear at trial.

13      MR. SISTI:  Right.

14      THE COURT:  What you're telling me though is that,

15  and I don't disagree, like, there's potentially a problem on

16  the horizon.  I get it.

17      MR. SISTI:  Yeah.  I mean, I'm just saying we're

18  inviting some confusion here, and I don't know why we would

19  want to do that when we can simplify the situation.  I guess

20  that's what I'm saying.

21      THE COURT:  Well, by dismissing the indictment.

22      MR. SISTI:  You can dismiss the indictment.  They

23  can bring another one.  I mean, how about that?

24      THE COURT:  I get it.  They'll have to if I

25  dismiss, or maybe they'll choose to if they don't want to buy

1     this issue.  I get it.  It's a fair point.  I get it.

2           MR. SISTI:  I mean, we don't mind -- you know, in

3     all honesty we don't mind the issue, but I don't know why we

4     would want to clutch onto it.

5           It is the first day of September.  I mean, there

6     are remedies that can be imposed at this point.

7           THE COURT:  True enough.  Fair point.

8           MR. SISTI:  Thank you.

9           THE COURT:  Mr. Aframe.

10           MR. AFRAME:  I guess I tried to discuss with you

11     sort of in good faith how I see the law.  I guess now I'm very

12     concerned that the strategy here is to inject the regulations

13     for the purpose of -- I mean, I don't see the argument that

14     they make as persuasive.  I know we're talking about buying

15     the argument on the Court of Appeals, and ultimately the Court

16     has an interest in that.  I, as the government, have an

17     interest in that.

18           I guess I don't see that argument as particularly

19     strong that -- you know, I mean, if the Court is not inclined

20     to agree with that argument, the simplest way is to just make

21     that ruling.  If that's not the Court's position, then, I

22     mean, I guess that's something else, but now I'm --

23           THE COURT:  Wait a minute.  I want to make sure I

24     understand you.  I'm not following you right now.

25           MR. AFRAME:  Sorry.

1          THE COURT:  If I want to buy what argument?

2          MR. AFRAME:  It seems like the Court was inclined

3   to not take the challenge to the regulations as a violation of

4   the major questions doctrine head-on.  And a way to avoid that

5   question is to say we don't need the regulations because the

6   statute gets us there.

7          THE COURT:  Sure.  But, I mean, if that wasn't

8   clear from everything I've said so far -- yeah, that is part

9   of my thinking.

10          MR. AFRAME:  Right.  And I guess what's concerning

11   about the colloquy here is it doesn't seem like it's going to

12   go that easily.

13          THE COURT:  You think if I keep that out of the

14   case or you do in your presentation or me in my instructions,

15   you're afraid they're going to reinject it through some other

16   means?

17          MR. AFRAME:  Right.  And I guess I'm concerned

18   about that.  I mean, just from my own perspective -- and the

19   Court has its own, but I'm going to tell you my perspective.

20   From my own perspective, I'm more worried about that than

21   defending the ruling that these regulations are valid on

22   appeal.  I guess that's what I'm saying.

23          THE COURT:  Right.  Just plain valid.

24          MR. AFRAME:  The major questions doctrine does not

25   mandate the invalidation of FinCEN's registration requirement.

1    That's what's concerning me about what I just heard.

2              THE COURT:  Understood.  Okay.

3              MR. GUERRIERO:  Can I just raise one other point,

4    your Honor, quickly?

5              THE COURT:  Yes.  Of course.

6              MR. GUERRIERO:  We don't really know yet how the

7    government would try to prove their case, but how are they

8    going to prove failure to register other than calling someone

9    from a regulatory agency and have them say they didn't comply

10   with our regulations?

11             THE COURT:  Well, because by -- all that person has

12   to say from FinCEN I guess or from the Treasury is there's no

13   record of any such registration.  It doesn't have to be an

14   opinion that there had to be or that it applies to bitcoin.

15   Just has it been registered.  You could open up that can of

16   worms, but that doesn't mean that they will.  It depends on

17   how they plan on trying their case, right?

18             MR. GUERRIERO:  Well, as I said, I don't know

19   exactly how they would present it, but I don't see how they

20   would present it --

21             THE COURT:  Well, I just told you how they would

22   present it.  Wouldn't they -- they would call up somebody from

23   an agency.  Do the records of the U.S. Treasury Department or

24   any subsidiary agency thereunder contain a registration by Mr.

25   Freeman of a bitcoin business, right?  And the answer would be

1    yes or no.  It wouldn't have to get into a whole, well, was he

2    required to with that witness.  That's how I think they would

3    show it.

4              MR. GUERRIERO:  But the only way that a person -- a

5    representative from that agency, the only way they could

6    answer that question is by reference to their own forms and

7    regulations, and there is no other process for anybody to

8    register.

9              THE COURT:  But they didn't register.  That's all

10   they would be proving.  They didn't register.  There's no

11   record of a registration.

12             Remember my view of the law is the statute required

13   them to register.

14             Now, do your records have any record of such

15   registration?  No.

16             What else?

17             MR. GUERRIERO:  Okay.  Well, I'm just reiterating

18   what I said earlier, but the statute requires them to register

19   in the manner prescribed by the Secretary.  That's exactly

20   what it says.  It says the Secretary shall prescribe the

21   regulations for registration.

22             THE COURT:  But I guess it would be up to you to

23   develop that if you wanted to which is maybe kind of the

24   subsidiary way of introducing this that Mr. Sisti was

25   referring to a minute ago.

1           MR. GUERRIERO:  I mean, maybe I'm not making myself

2    clear.

3           THE COURT:  Here's the thing.  So you say, well, is

4    there a manner for bitcoin?  I mean, is there a manner of

5    registration for bitcoin?  Is there a form?  Is there a this?

6    Is there a that?  And the witness could answer, but that would

7    be you.  That would be you putting it in the case, wouldn't

8    it?

9           MR. GUERRIERO:  But is the government going to -- I

10   mean, the government has to show not only that they failed to

11   register as required by the statute but they failed to

12   register in accordance with the regulations promulgated by the

13   Secretary.  I mean, that's what the statute says.  The manner

14   of registration shall be prescribed by the Secretary.

15           THE COURT:  I work for -- where do you register

16   these things?

17           MR. AFRAME:  FinCEN.

18           THE COURT:  I work for FinCEN.  Do you have a means

19   and manner, a recognized process for registering bitcoin?

20   Yes.  Has any such registration been made by these defendants?

21   No.

22           Problem?

23           MR. GUERRIERO:  Yes.  I think I would ask for a

24   directed verdict if that was all of the evidence because they

25   haven't introduced evidence of a failure to comply with the

1    regulations as prescribed by the Secretary, and the statute

2    requires that.

3              THE COURT:  Exactly.  The statute requires -- oh.

4              MR. GUERRIERO:  The statute requires the

5    regulations, and there's only one way of getting licensed.

6              THE COURT:  In my hypothetical I said, I asked does

7    your agency have a form, a manner, a means of registering

8    bitcoin?  Yes.

9              Now, it exists.  It didn't happen.

10             Why is that a directed verdict?

11             MR. GUERRIERO:  Because they can't introduce --

12             THE COURT:  And even if you get your directed

13   verdict, he said he's not going to the jury with that anyway

14   because it's disjunctive.  He's saying I'm going to go with

15   the statute.

16             MR. GUERRIERO:  Then what's the violation of the

17   statute?  If they didn't violate a reg, they didn't violate

18   the statute.

19             THE COURT:  Failure to register.  Period.

20             MR. GUERRIERO:  Okay.  I won't belabor it, but I

21   think that the registration requirement under the statute

22   requires regulations implementing it.

23             THE COURT:  In a certain way.  Oh, requires a

24   regulation before the obligation even arises to comply with

25   it?

1          MR. GUERRIERO:  Exactly.  Exactly.  And it says the

2    manner of registration shall be prescribed by the Secretary.

3    The manner.  And so if they don't put in evidence of the

4    manner in which the person violated the regulations, then they

5    haven't proven a violation of the statute.

6          THE COURT:  So your point is even if they don't

7    focus on the regs, just the statute, they can't prove their

8    case --

9          MR. GUERRIERO:  Without proving --

10         THE COURT:  -- or the statute still requires a

11   manner of registration that somehow still implicates

12   administrative law in a way that the jury is going to have to

13   hear about it.

14         MR. GUERRIERO:  That's exactly right.

15         THE COURT:  What do you say about that, Mr. Aframe?

16         Your point is -- and I guess -- by the way, I

17   haven't forgotten your major point which is that these

18   regulations are lawful.  I'm with you.

19         MR. AFRAME:  Okay.  It says:  Any person who

20   controls or owns a money transmitting business shall register

21   the business with the Secretary of the Treasury not later than

22   180 days.

23         So they shall register the business.

24         Then the question is, what form do you have to -- I

25   mean, Mr. Guerriero takes a very broad meaning of the form and

1  manner.  I just take that to mean, okay, that's required by

2  the statute.  So as a matter of procedure --

3          THE COURT:  How it looks.

4          MR. AFRAME:  -- what do they have to do then?

5          They have to fill out the form.  They have to

6  provide this information, which by the way is in the statute,

7  and they have to send it to us at our office in Washington,

8  D.C., within 180 days of them doing that.

9          Have they done that?  No.  Have they filed anything

10 with you?  No.  Have you sent them letters telling them to?

11 Yes.  Have they filed anything?  No.

12         THE COURT:  So I'm just going to play it out.  Mr.

13 Freeman's on the witness stand.

14         You never have to take the witness stand.  Let's be

15 clear about that.  You know that.  You have great counsel.

16 It's just a hypothetical.

17         He gets on the witness stand.  I tried.  I looked

18 at the law, and I didn't see a means or manner that applied to

19 bitcoin.  I couldn't.

20         MR. AFRAME:  And that's because he understood the

21 major questions doctrine didn't require him to do so?

22         THE COURT:  No, just that I read it pre-2021.  I

23 read the statute and I didn't think the definition applied to

24 my business.

25         MR. AFRAME:  It doesn't matter because -- I mean,

1  he doesn't need that mens rea.  That's not what's required.

2  That's just what the law is now.  I mean, this is a crime that

3  doesn't require knowledge of the need to register.  It

4  requires only that you knew you didn't register, which he

5  knows he didn't register.  He might say I thought I didn't

6  have to, but that's not a defense said Congress.

7       THE COURT:  Mr. Guerriero's theory I guess assumes

8  that the registration necessarily implicates a certain means

9  and manner of registration that doesn't exist until a

10 regulation that applied to bitcoin has been promulgated.  I

11 know that's kind of -- you don't have to accept that.  I'm

12 just trying to appreciate the argument for what it is, and

13 that's what it is, right?

14      MR. AFRAME:  And there's no dispute that there is

15 such a regulation.  That just goes back to him saying that

16 regulation is invalid.  That regulation exists and has existed

17 throughout.

18      THE COURT:  We're super in the weeds, but it's

19 okay.

20      MR. AFRAME:  Yes.

21      THE COURT:  Brief recess.

22      MR. AFRAME:  Okay.

23      (RECESS)

24      THE COURT:  All right.  I realize, by the way, we

25 haven't talked about the motion for the bill of particulars.

1     So I'll give you a ruling on this motion, and then we'll talk

2     about that.

3            All right.  This motion to dismiss is denied.   To

4     me this is just a -- I don't think the major case and

5     questions doctrine requires the dismissal of this indictment.

6     I view the major case and questions doctrine not as a -- it

7     certainly is a -- it's not primarily to the Court a doctrine

8     about statutory administrative overreach.  It is a doctrine of

9     statutory interpretation.

10            To the extent it's about statutory overreach or

11     about administrative overreach, it's only a question of

12     administrative overreach when applied to an administrative

13     agency's interpretation of its enabling legislation.

14            The bottom line though is it's a doctrine that

15     determines whether the Court needs -- Courts interpret

16     statutes, and the agency enforcing this statute is the

17     Department of Justice.  But in neither case, whether it's

18     FinCEN or DOJ, it's not a situation where the Court is

19     required to exercise deference to an administrative agency

20     interpretation, which is what the major case and questions

21     doctrine requires.

22            It's a scenario -- I tend to think of it in the way

23     Chief Justice Roberts described it in King v. Burwell.  It's a

24     question of whether the Court needs to defer to an agency's

25     interpretation of a statute in crucially important economic

1    and political questions.

2            Now, I'll explain in a minute or two why I don't

3    even think the doctrine applies to this particular

4    interpretive question, the alleged interpretation by FinCEN

5    that prior to the 2021 amendments its registration

6    requirements applied to bitcoin.

7            But that aside, there's no statutory ambiguity

8    here.  Funds clearly has always applied to bitcoin from the

9    time bitcoin came into existence.  Many Courts have ruled

10   that, and this Court agrees.

11           The legislative activities leading up to and

12   including the 2021 amendments don't change that.  The statute

13   was not changed vis-a-vis its application to virtual currency.

14   It's arguably clarified, but it was not an expansion of the

15   statute at least where virtual currency and bitcoin are

16   concerned.

17           So it doesn't matter to this Court what FinCEN's

18   interpretation of the statute was.  I'm not deferring to it.

19   I don't believe it's an ambiguous reference, the reference to

20   funds, which is the key reference here in the statute.  I

21   don't think it requires deference to any agency.  I think it's

22   an unambiguous term that encompasses bitcoin and did prior to

23   2021 when the amendments were enacted.  That's number one.

24           So, frankly, I don't need to decide whether the

25   major case and questions doctrine applies here.  I just

1    interpret the statute to cover bitcoin and require the

2    registrations at issue here.

3            I want to be clear about this.  There was a lot of

4    conversation in the hearing about removing the regs from the

5    criminal trial.  I'm not suggesting that that's legally

6    necessary at all.  It was just a sort of conversation to me

7    about the way the prosecution might have attempted to kind of

8    avoid this issue to the extent it's an issue.  I don't think

9    it's an issue.  So I just don't want to have anybody interpret

10   this as a ruling that somehow the administrative law scheme is

11   out of the case.  That's up to the prosecution.  I'm not

12   ruling that it needs to be.

13           So, number one, I don't think the major case and

14   questions doctrine is implicated here.

15           Number two, there's another reason I don't think

16   it's implicated here.  I don't think this is a major case or

17   question.  I'm not trying to say it's unimportant.  I'm just

18   saying that it doesn't rise to the level of major cases and

19   questions that have been recognized by the Supreme Court and

20   other courts in areas like the Affordable Care Act or the

21   environmental regulatory scheme implicated by the recent EPA

22   versus West Virginia case.  So that's number two.

23           Number three, even if this was a major case or

24   question, my view is that FinCEN was acting within its

25   authority based on a clear delegation.

1           Congress's statement was that the agency could

2    regulate "any other person who engages as a business in the

3    transmission of funds, including any person who engages as a

4    business in an informal money transfer system or any network

5    of people who engage as a business in facilitating the

6    transfer of money domestically or internationally outside of

7    the conventional financial institution's system."

8           In 31 U.S.C. 5330, the West Virginia case, the

9    issue was whether a broader conception of EPA's authority was

10   within the power granted to it by the Clean Air Act, and the

11   EPA took it further than the statutory delegation.

12          This isn't that kind of situation at all.  When

13   Congress recently amended 5330 to include virtual currency, it

14   hadn't considered or rejected bills like that in the past,

15   which would suggest that FinCEN was attempting, like, some

16   type of regulatory workaround to these prior legislative

17   failures.  There were no such failures.

18          The amendment was to allow FinCEN "to continue the

19   financial system from illicit activity, counter money

20   laundering and the financing of terrorism, and promote

21   national security," skipping some text here, "Although the use

22   and trading of virtual currencies are illegal practices, some

23   terrorists and criminals sought to exploit vulnerabilities in

24   the global financial system and increasingly relied on virtual

25   currencies to move illicit funds."

1              I'm citing Public Law No. 116-283 there, 134

2    statute 3388.  Pinpoint cite to 4552 in 2021.

3              So, look, that's the ruling, though.  The major

4    case and questions doctrine is not implicated.  It's not

5    implicated because this is not an ambiguous delegation of

6    authority that requires judicial deference to Executive Branch

7    authority, number one.

8              Number two, it's not implicated because it's not a

9    major case or question in my view.  And, third -- well, if it

10   is implicated, I think FinCEN was in compliance.

11             Mr. Guerriero's very interesting argument about the

12   delegation of authority to FinCEN to establish the means and

13   manner of registration, I view that as really more just

14   procedural, you know, not that no such registration was

15   required until the establishment of such a process.

16             I will write an order on this.  I can't guarantee

17   you, though, it's going to be written by trial.  It may be.

18   It may not be.  Usually, like, when I write a suppression

19   order, I rule from the bench and don't issue the written order

20   until much later, if necessary, and that's how I'm going to

21   approach this, but the motion is denied.

22             All right.  Let's talk about the bill of

23   particulars.  I'll give you my take on this -- well, and you

24   can incorporate that into your argument.

25             I'm probably a little bit -- my approach of a bill

1  of particulars probably isn't perfectly aligned with federal

2  law because I guess my experience with state practice taught

3  me that, you know, a bill of particulars can be helpful to

4  criminal prosecutions.  I don't mean helpful to the

5  prosecution but helpful to the process and putting everybody

6  on notice of what's going on.  But federal law doesn't

7  generally require them except under very specific

8  circumstances.  I, nonetheless, have ordered them in the past,

9  and I exercise my discretion generally to do so only because I

10 think it's a helpful part of the process.

11           Of course the part you have to be careful about is

12 not adding to the prosecution's burden of proof with a bill in

13 a situation where that isn't the legal effect.  Because in the

14 state system when you issue a bill, that becomes, like, the

15 elements.  And so when I issue an order on this, to the extent

16 they order a bill, I'll be careful about making that clear one

17 way or the other whether it's any kind of modification.

18           So I guess all I'm trying to say to you is I'm

19 usually pretty open to a bill of particulars.  I believe in

20 criminal defendants being placed on notice of the charges

21 against them beyond just the fact that something is

22 quote-unquote in the discovery.

23           Go ahead, Mr. Sisti.

24           MR. SISTI:  I think that's the bottom line.  I

25 mean, the reference in the discovery is quite interesting,

1     but, you know, as we're receiving discovery as recently as

2     August 22nd of this year in the form of hundreds of more

3     pages, it begins to concern me as to whether or not we can

4     have this tailored and ready to go depending on the 7,700 --

5     or 7,000 plus pages of discovery we already have.

6              I mean, I can make it pretty simple for the Court.

7     Naturally, we would like to have witnesses.  I mean, that

8     could really get to the heart of the whole thing if we knew

9     who was going to be called.  I mean, we're 60 days before

10    trial.

11             THE COURT:  Uh-huh.

12             MR. SISTI:  I don't think I'm asking for much.  I

13    mean, they must know who their witnesses are by now.  I know

14    they've been doing interviews as recently as about ten days

15    ago, and we're getting reports, but I don't even know if

16    they're locked in as actual witnesses, their interviews.

17             With regard to the specificity of the individuals

18    that were "paid," you know, I don't know who they are.  We

19    haven't gotten a Giglio material update.

20             THE COURT:  I'm assuming that they were some of the

21    co-defendants.  That's just an assumption.

22             MR. SISTI:  Yeah.  I mean, I know what's going on

23    with regard to the plea arrangements, but I'm not quite sure

24    what the exact arrangements were with regard to Giglio

25    material.

1    THE COURT:  I've been asking at those pleas, you

2  know, is this a person we can expect to hear from at trial, is

3  there a 5K, and the answer has generally been no 5K and no

4  agreement.

5    MR. SISTI:  That's why I guess that's troubling me.

6  So who would they be then?  I don't know.  No 5K and no

7  agreement also means I don't know if they're on the witness

8  list.

9    THE COURT:  Yeah.  I get it.

10    MR. SISTI:  I think we're thinking the same way,

11  Judge.  I mean, I'm not particularly interested in expanding

12  their burden of proof, but they're going to have to hit these

13  elements and they're going to have to give me the information

14  that I'm asking for anyhow.

15    THE COURT:  Well, let me ask you this question.

16  Are you basically saying that if you can get a witness list,

17  like, well in advance of the usual deadline, that that's more

18  important to you than a bill of particulars?

19    MR. SISTI:  I have to be honest with you.  That

20  would actually clarify where we're going here.  I mean, you

21  know, we're taking shots in the dark now wondering

22  who's coming.

23    THE COURT:  Have you had that conversation with

24  these people?

25    MR. SISTI:  I think I filed that motion back in

```
 1   late July.  That's a conversation from what I can tell.
 2              THE COURT:  All right.  I get it.
 3              MR. SISTI:  Thank you.
 4              THE COURT:  Mr. Kennedy.
 5              MR. KENNEDY:  If that will sort of resolve this
 6   issue, the government is happy to provide a sort of witness
 7   list of who we would intend to call understanding that a lot
 8   of these witnesses are elderly.  We are still working on how
 9   we're going to get some of these people to trial due to their
10   disabilities.  But we're happy to provide a witness list with
11   the understanding that, you know --
12              THE COURT:  They may not all get called.  I get it.
13              MR. KENNEDY:  Yeah.
14              THE COURT:  I don't think they're going to object
15   to anybody you don't call.
16              All right.  Let's talk turkey then.  By when?
17              MR. KENNEDY:  By early next week?  Late next week?
18              By Friday next week?
19              THE COURT:  If by the end of next week you get a
20   witness list, does that put you in a position to --
21              MR. SISTI:  If I can just have a moment, your
22   Honor?
23              THE COURT:  Yeah.
24              (Attorney Sisti confers with Attorney Guerriero)
25              MR. SISTI:  Your Honor, if we get a realistic
```

1    witness list and not some complete saturation of every name

2    that's in there, that's fine.

3                THE COURT:  Yeah.  I don't think these people would

4    do that.

5                MR. SISTI:  We've all seen that.

6                THE COURT:  Because we're trying to work it out.

7                Yeah, not the 150 witness list.

8                MR. KENNEDY:  I think these would be realistic

9    people that we would anticipate that we would actually prep

10   and want to call.

11               THE COURT:  The way I put it in my pretrial is the

12   actual will-call witness list, right?  You can provide that,

13   understanding that you probably can't deliver a hundred

14   percent on it, by next Friday.  Can you live with that?

15               MR. SISTI:  We're good with that.

16               THE COURT:  All right.  I'm going to rule on the

17   motion to withdraw and by agreement in reliance on the

18   arrangements here today.  Fair enough?

19               MR. SISTI:  That's fine.  Yes.

20               THE COURT:  All right.

21               Counsel, that was very well argued.  I appreciate

22   it.  I always appreciate when people are so well prepared and

23   articulate and persuasive.

24               Anything else I can do for you people?  You've got

25   a couple motions that aren't ripe yet, the motions in

```
 1    limine and the Daubert.  Anything else?
 2              MS. MACDONALD:  The only other thing, your Honor,
 3    is they filed a notice of public authorities defense that we
 4    filed a response to that I think is ripe if there was anything
 5    the Court wanted to hear on that.
 6              THE COURT:  I guess I'm not ready to rule on it
 7    because I haven't focused on it.
 8              MS. MACDONALD:  Okay.
 9              THE COURT:  Do you want to talk about it though?
10    Go ahead.  I'll listen.  Maybe I can just --
11              MR. SISTI:  I mean, we've had a lot of discussion
12    that's been dancing around that whole issue all morning.  I
13    mean, if you just look at the defense motion to dismiss on
14    page 12, a lot of it has to do with that.
15              I mean, there is reliance on this particular
16    representation from banking in the state of New Hampshire that
17    was -- we amended that or attached that to the pleading that
18    actually came from an actual authority in the state of New
19    Hampshire.
20              I think the federal government's approach as to it
21    has to be a federal employee or a federal agent is probably
22    misplaced.  I mean, I just two weeks ago pled a case in here
23    that had to do with a patrol officer in Hooksett making an
24    arrest.  I mean, he's not a federal agent, but if he did make
25    some representation to my client hypothetically in that case
```

1    that allowed him to break the law somehow or another and my

2    client relied upon it, then I would believe that this

3    particular notice and this procedure of placing the government

4    and the Court on notice would basically be the way we would

5    deal with that.

6              THE COURT:  So a public authority defense,

7    though -- talk to me mechanically, like, what it means and how

8    it works.

9              MR. SISTI:  The public authority defense that we

10   would be relying on is that our client, at least Mr. Freeman,

11   relied upon a specific statement that was made by a recognized

12   public authority in the state of New Hampshire dealing

13   specifically with the operation that was taking place.  And

14   that's memorialized in a letter from Freeman's lawyer, the

15   church's lawyer, all right, that was appended to the pleading.

16   It lays it right out.  That's in the head of him as he's going

17   forward with the transactions that are taking place.

18             There is no question that she was a public

19   authority, and I don't think that you get to just say, well,

20   it's a state authority so you can't bring this to the

21   attention of the Court that it somehow releases you from this

22   particular approach on defending, okay?  It's a person with

23   authority, a banking person, dealing with the subject matter

24   that is the subject of this prosecution.  It has to do with

25   money transmission.  It has to do with licensing.

```
 1                  THE COURT:  Okay.  I get it.

 2                  Is your objection -- I think I actually read it.  I

 3    just don't remember.

 4                  AUSA MacDonald, is your objection that they

 5    shouldn't get a jury instruction on it or that a jury

 6    shouldn't even hear about it?

 7                  MS. MACDONALD:  Well, it's sort of two issues.

 8    There's my response to this, and then I filed a motion in

 9    limine to exclude the evidence of the state law.

10                  THE COURT:  Okay.  Mr. Sisti says -- you can

11    probably cut right to it.  I can't guarantee you I'll rule

12    right now, but he says I don't think you can distinguish

13    between state and federal, and you're probably about to tell

14    me, yeah, you probably can, right?

15                  MS. MACDONALD:  Yes.

16                  THE COURT:  That sounds like federal law to me

17    that, you know, will probably develop, but is that the law?

18                  MS. MACDONALD:  Well, I mean, yeah, that's the law.

19                  I mean, there is another prong of 1960 that we

20    didn't charge that criminalizes failure to comply with the

21    state law, but this has nothing to do with it.  A state

22    banking official talking about state law has absolutely no

23    relevance to the federal law which the defendant is charged.

24                  THE COURT:  I see the law is there.  My question

25    is, is there authority for that proposition?
```

1             MS. MACDONALD:  There is.

2             THE COURT:  Okay.  I'll look at it.

3             MR. SISTI:  I mean, if you take a look at this

4    thing and you set it over here -- if one of my clients was

5    being prosecuted let's say for possession of child pornography

6    and his local police department comes to him and takes his

7    phone and says, well, you're okay because, you know, that

8    individual was 16 or something like that, it could be a

9    mistake that that person relayed to my client, but my client

10   certainly could say, okay, I feel safe now.  If I'm dealing

11   with someone that's 16 or over, okay, it's okay.  Well, it's

12   not okay, all right?  It's not okay.  If it's charged in

13   federal court, it's certainly not okay, but you can certainly

14   rely on that authority and you can bring that to the attention

15   of the jury.  Why would you be barred from that?  Especially

16   if there's a prosecution --

17            THE COURT:  It's not that your argument doesn't

18   make sense to me, because it does.  It's just that it wouldn't

19   surprise me -- and I just don't remember.  It wouldn't

20   surprise me though if there have been federal decisions that

21   have just plain ruled that out.  I just don't know yet.  I'll

22   look at that.

23            MR. SISTI:  Okay.  But if it's being prosecuted in

24   this courtroom and it's being developed by a local official --

25            THE COURT:  I know.  Right?

```
 1                    MR. SISTI:  Yeah.

 2                    THE COURT:  It's one of those -- you know, the

 3    analogy is like double jeopardy though, right, sort of, right?

 4                    MR. SISTI:  I don't know.  It's single jeopardy

 5    because if you think about it --

 6                    THE COURT:  Oh, I know it's not double jeopardy.

 7    The analogy though is, right?  Because we know you can be

 8    charged federally for crimes after you're acquitted in state

 9    court.  That happens.  It's sort of the same thing.  It's not

10    exactly the same, but it's sort of the same thing though, and

11    the law on that particular issue is not defendant friendly,

12    you know.

13                    MR. SISTI:  No, it's understood.

14                    THE COURT:  I'll look at it though and I'll get you

15    a ruling well in advance.  There won't be any question about

16    how the trial is going to play out.  You'll know one way or

17    the other.

18                    MR. SISTI:  Thank you.

19                    MS. MACDONALD:  Thank you.

20                    THE COURT:  Okay.  Kellie, anything you want me to

21    cover that I haven't picked up?

22                    (Off the record)

23                    (Conclusion of hearing at 11:35 a.m.)

24

25
```

```
 1                     C E R T I F I C A T E

 2

 3

 4         I, Susan M. Bateman, do hereby certify that the

 5   foregoing transcript is a true and accurate transcription of

 6   the within proceedings to the best of my knowledge, skill,

 7   ability and belief.

 8

 9

10   Submitted:   3-1-23      /s/   Susan M. Bateman
                              SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```