**IN THE UNITED STATES DISTRICT COURTFOR**
**THE DISTRICT OF NEW HAMPSHIRE**

THE UNITED STATES OF AMERICA

         v.                               No. 1:21-cr-41-JL

ARIA DIMEZZO

<u>DEFENSE SENTENCING MEMORANUM AND MOTION FOR VARIANCE</u>

Aria DiMezzo is before the Court for sentencing on one count of operating an unlicensed money transmitting business. Despite the guidelines sentence and the request of the government, the Court should not incarcerate Aria. Her crime does not involve fraud. No one suffered a loss because of her crime. To the contrary, it is conceded that no one is due any restitution. Moreover, Aria suffers from PTSD and Major Depressive Disorder as a result of childhood trauma. Her struggles offer, not an excuse, but an explanation for her conduct. She trusted those she should not have trusted, with the result that, despite being a person with a strong work history and no criminal record, she became involved with Ian Freeman and others, and thus charged in this case. The Court can appropriately punish Aria and deter others without sending her to prison. For the reasons set forth below, the defense seeks a sentence of time served and three years of supervised release with a special condition of home confinement for one year. However, before explaining why this is the correct sentence, the defense must first lodge objections to the claimed factual basis of the government's demands for incarceration.

<u>The Government Wrongly Seeks to Punish Aria for Ian Freeman's Crimes and Wrongly Claims</u>
<u>that Aria Has Not Accepted Responsibility for Her Conduct.</u>

Aria pleaded guilty to the regulatory offense of violating 18 U.S.C. §1960 by not obtaining a license for the business of exchanging bitcoin for currency. Doc. 139, Count Three. In the Plea Agreement, the parties agreed on a factual basis for the guilty plea to this charge.

Doc. 206, §3. There is no allegation in that factual basis that Aria defrauded any person. There is

no allegation that she caused a loss of money or any other harm to any person. To the contrary,

the government has agreed to dismiss charges alleging such conduct upon the Court's acceptance

of the plea agreement. *Id*. at §1. Nevertheless, the government now argues that the Court should

sentence Aria on the basis of alleged facts which are contradicted by the Presentence

Investigation Report ("PSIR"), which Aria has never been allowed an opportunity to contest, and

which the government cannot prove. The Court should reject the government's argument.

*The Government's Claims.*

The government bases its effort to recast the case against Aria on the "evidence adduced

at [Ian] Freeman's trial." Gov. Memo. Doc. 295 at 2. The government describes the evidence

against Ian Freeman and attempts to weave Aria's culpability into Freeman's. In essence, the

government seeks to sentence Aria for crimes committed by Freeman or others. For example, the

government says that Freeman referred "scammers" who were "laundering" money to DiMezzo

so the scammers could direct their victims to purchase bitcoin. *Id*. The government then points to

photographs of the victims of the scammers on Aria's phone. *Id*. at 2-3. The government ignores

the fact that Aria requested and kept such photos and other purchase records for the legitimate

and laudable purpose of documenting the identities of those who were buying bitcoin. Instead,

the government uses her documentation of the identities of the purchasers to make her

responsible for Freeman's offenses. The government points to the photos and records to claim

that since those people were victimized by Freeman or others, they must have also been

victimized by Aria. *Id*. at 3.

The government makes another leap by quoting Aria when she discussed the practice of

not interrogating purchasers about why they were buying bitcoin. The government says this was

Aria's adoption of Freeman's "Golden Rule" of ignoring obviously suspicious transactions. Again, citing Aria's efforts to document the identity of purchasers – as if someone engaged in fraud would be so careful to create and preserve such evidence and do so honestly and accurately – the government faults Aria for not challenging and querying purchasers beyond documenting their identity. *Id*. at 4.

The government then takes the additional step of ascribing to Aria the losses caused by scammers or by Freeman. Referring again to victims in <u>Freeman's</u> case who testified at <u>Freeman's</u> trial, against <u>Freeman</u>, the government describes how the victims lost hundreds of thousands of dollars and, in some instances, their life savings. Here again, the government refers to "photo after photo of clearly vulnerable, mostly elderly people," as if they were victims of Aria DiMezzo's failure to obtain a money transmission license, rather than the victims of others (scammers in the first instance, by all accounts, and Freeman, according to his jury's verdict).

Finally, still referring to the victims from Freeman's case, the government quotes Aria's comments on her talk show criticizing some of those who fell victim to the scams. Here, the government claims that Aria "takes no responsibility and has no remorse" for her "role in making the scammers harder for law enforcement to catch."

*Refutation of the Government's Claims Regarding Culpability*

The Presentence Investigation Report, Doc. 291, refutes the government's claims. The PSIR describes the offense conduct. PSIR, Doc. 291, ¶¶ 8-41. The probation officer wrote that the description of the offense conduct comes from "statements of facts provided by the government and a review of discovery materials." *Id*. ¶ 8. The PSIR presents a detailed discussion of all of the evidence against all of the defendants in all of the cases (except one which was dismissed). In the section specifically addressing Aria's conduct, ¶¶ 22-27, the

probation officer notes that many (but not all of DiMezzo's customers were referred by Freeman. The probation officer specifically addresses a victim from Freeman's case, H.J., who is described by the government as having lost "more than $600,000." Gov. Memo. Doc 295 at 4, n. 2 and n. 3. However, the probation officer does not reach the same conclusion as the government regarding Aria's culpability and responsibility for this loss. The government wrote in its memorandum, "DiMezzo, like Freeman, knew the harm her business was causing." The PSIR directly contradicts this statement by the government. The probation officer wrote:

> While the transactions may have been inherently suspicious, **there is no evidence DiMezzo was aware of the underlying fraudulent scam**.

PSIR, Doc. 291, ¶ 25. (Emphasis added.) Not only was this conclusion based on discovery and statements provided by the government, *Id*. at ¶ 8, the government did not file any objections to the PSIR, much less a specific objection to this finding. *Id*. at Doc. 291-1 (attachment regarding objections)("The government submitted no objections to the presentence report.").

Similarly, the probation officer did not find the "specific offense characteristic" that Aria "knew or believed the funds were proceeds of unlawful activity, or were intended to promote unlawful activity." The sentencing guideline for Aria's offense is USSG §2S1.3. That guideline provides specific offense characteristics which would aggravate and add to the offense level. One aggravating specific offense characteristic is whether the defendant "knew or believed the funds were proceeds of unlawful activity, or were intended to promote unlawful activity ...." USSG §2S1.3(b)(1). The PSIR, in ¶47, states the specific offense characteristics for Aria's case as "none." Thus, the probation officer found that Aria did not know or believe that the funds derived from an unlawful activity, nor did she know or believe the funds were intended to promote such an activity.

Once more, the government did not object to the PSIR. The government made no objection to the absence of a finding of the specific offense characteristic in USSG §2S1.3(b)(1). To the contrary, the government had already agreed in the Plea Agreement, Doc, 206, at §6, to a stipulated total offense level of 19, which is the offense level determined by the base offense level of 6 in USSG §2S1.3(a)(2), plus the increase pursuant to the monetary table in USSG §2B1.1(b)(1)(I). PSIR ¶46. If the government was contending that Aria knew about acts of fraud or that her failure to have a license was promoting unlawful activity, it would not have agreed to a total offense level of 19. Thus, in both the Plea Agreement and through non-objection to the PSIR, the government has agreed, contrary to its sentencing memorandum, that Aria did not know that victims like H.J. were being defrauded.

The reality is that Aria did not interrogate bitcoin purchasers about their motives for purchasing bitcoin because to do so would have been contrary to her political beliefs and the value she saw in Bitcoin. According to her beliefs at the time, Bitcoin allowed people to engage in private financial transactions without the involvement of the government. As a person who believes we are better off with little or no government in our lives, Bitcoin greatly appealed to Aria. Misguided or not, this was her motivation. If she had known that anyone who was purchasing bitcoin from her was the victim of fraud, she would not have sold bitcoin to that person.

The government also claims that Aria is responsible for the losses suffered by the victims in Freeman's case. Yet, those claims are also contradicted by the PSIR. The PSIR states, regarding Aria's case, that "there is no identifiable victim." PSIR, Doc. 291, ¶ 42. It further finds that, "Restitution is not applicable in this case." *Id*. ¶ 108. Here again, the government filed no objection to these conclusions in the PSIR. *Id*. at Doc. 291-1. The government has not claimed

5

that there is any victim of Aria's crime and, in fact, agreed at the change of plea no restitution is owed and that no forfeiture is being sought. The only reasonable explanation for those statements from the government is that it agreed no one suffered any loss as a result of Aria's failure to get a license to operate her business.

*Refutation of the Government's Claims that Aria Has Failed to Accept Responsibility*

Likewise, regarding the government's claim that Aria has not shown remorse and has failed to accept responsibility for her conduct, the PSIR says the opposite. The PSIR specifically says:

**The defendant has clearly demonstrated acceptance of responsibility for the offense.**

*Id*., ¶ 42 (emphasis added). The probation officer further found that Aria accepted responsibility "based upon [her] guilty plea and acceptance of the offense conduct in the plea agreement and/or the facts proffered by the government . . . at the change of plea hearing." *Id*. at ¶ 44. In addition, Aria "assisted authorities in the investigation or prosecution of [her] own misconduct by timely notifying authorities of the intention to plead guilty." *Id*. at ¶ 54

Beyond Aria's acceptance of responsibility as recognized in the PSIR, she has attempted to assist the government in recovering funds or other assets which may have come from victims of the crimes of others. She has provided to the government, without any order from this court, all of the information needed to access her cryptocurrency wallets and accounts seized by the government in this case. She authorized counsel to provide her usernames, PINs, and passwords for those accounts. Counsel did so. Aria has further stated to the government, through counsel, that she agrees to give up all rights to those assets. While Aria was not aware of the fraudulent activities of others, she is sympathetic to the victims of that activity, especially to the extent she unwittingly played a role. Yet, the government would sentence Aria for crimes she did not

6

commit, while at the same time accepting from her assets she is giving up to provide some recovery for those victims of others.

<u>If the Court Considers Accepting the Claims of the Government Regarding Aria's Culpability for Other Offenses, then the Court Should Reschedule the Sentencing Hearing to a Later Date.</u>

As noted above, the government did not object to the PSIR. Prior to filing its sentencing memorandum, the government did not assert claims that Aria failed to accept responsibility for her offense. Similarly, the government did not object to the PSIR regarding whether Aria was aware of any fraud or whether she caused anyone to lose money. The government now makes those claims citing the evidence presented at the trial of Ian Freeman. If the court intends to rely on the evidence against Ian Freeman to send Aria to prison, or to make any finding of fact, then the defense respectfully submits that the sentencing hearing in this case should rescheduled to allow the defense sufficient time to read and analyze the transcript of Freeman's trial, and then decide whether the defense seeks to bring any witnesses to the sentencing hearing to testify regarding the issues of fact in dispute.

The Federal Rules of Evidence do not apply at a sentencing hearing and the Court is generally permitted to consider evidence it finds relevant and reliable. Fed. Rule Evid. 1101(d)(3); U.S.S.G. § 6A1.3(a). Although the cases are older, it appears that a trial court conducting a sentencing hearing may rely on evidence adduced at the trial of another defendant. *United States v. McCarthy*, 961 F.2d 972, 979 (1st Cir. 1992); *United States v. Berzon*, 941 F.2d 8, 19 (1st Cir. 1991). However, there is a proviso to that rule. If the court is going to rely on such evidence, the Court must give the defense notice and an opportunity to challenge the evidence. *McCarthy*, 961 F.2d at 979; *Berzon*, 941 F. 2d at 19.

Aria DiMezzo was not a party to Ian Freeman's trial. She attended one day of the trial as a member of the public. She does not know what the witnesses at Ian Freeman's trial said about her.

Undersigned counsel is appointed in this case. Counsel attended a few select portions of Ian Freeman's trial, including part of the testimony of one FBI agent (Katie Thibeault) and the closing arguments. Counsel did not attend Freeman's trial, for example, to hear the testimony of the victims described in the government memorandum. Counsel does not believe it would be expected, or even approved by the Court, for appointed counsel to attend the entire lengthy trial of a co-defendant.

In addition, counsel has not obtained or read the transcripts of Ian Freeman's trial. Again, absent notice that such evidence would be used in Aria's sentencing hearing, counsel would not be expected to undertake such a monumental task.

If the evidence from Freeman's trial is to be part of the sentencing in this case, then the defense should be afforded a fair opportunity to learn what that evidence is. A criminal defendant enjoys a due process right not to be sentenced on false information, and due process therefore requires that the defendant be given an adequate opportunity to refute information relied on at sentencing." *United States v. Stile*, 845 F.3d 425, 430 (1st Cir. 2017) (quotation marks and citation omitted.). No one representing Aria's interests was present to challenge the evidence at Freeman's trial. The defense deserves a fair chance to test the reliability of the claims against Aria and to present its own evidence on the issues raised.

Freeman's trial lasted several weeks. The transcripts are surely many and lengthy. Having just received the government's memorandum referencing evidence from Freeman's trial, counsel will need additional time to review the transcripts, discuss them with Aria DiMezzo, investigate

the government claims relating to that evidence, and muster evidence for the sentencing hearing. Therefore, if the Court considers relying on the assertions in the government memorandum based on evidence from Freeman's trial, the Court should continue the sentencing hearing for at least 90 days.

<u>The Sentencing Guidelines Should Not Be Given Any Weight in this Case.</u>

Assuming the Court proceeds with sentencing, the Court should recognize that it is not required to follow the sentencing guidelines and that it may grant a variance as requested by the defense.

As required by 18 U.S.C. §3553, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," and then impose a sentence "sufficient, but not greater than necessary, to comply with" the listed purposes of the statute:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

The Court is also required to consider the kinds of sentences available, the guidelines and policy statements of the Sentencing Commission, the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and the need to provide restitution to any victims.

Regarding the sentencing guidelines, the Court is not bound by the guidelines and may not mechanically presume they determine a reasonable sentencing range. *United States v.*

*Booker*, 543 U.S. 220, 259-62 (2005); *Gall v. United States*, 552 U.S. 38, 49-50, (2007); *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). As the First Circuit explained in *Martin*:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S. Ct. 586 (2008) at 598.

*Martin*, 520 F.3d at 91.

This is exactly the type of case in which a substantial variance is warranted. For the reasons set forth below, the Court should grant a variance, and, in adherence to 18 U.S.C. §3553, sentence Aria to a non-incarcerative sentence because incarceration is not necessary to achieve the purposes of sentencing as set forth in the statute.

The Court Should Grant a Variance Because the Monetary Values in USSG §2B1.1(b)(1)(I) Overstate the Seriousness of the Offense in this Case.

For the offense in this case, pursuant to USSG §2B1.1(b)(1)(I), 16 offense levels are added to the base offense level of 6, which derives from USSG §2S1.3. The added 16 levels are a result of the total value of funds which passed through the accounts of Aria's unlicensed businesses - $3,178,895.62. This is not the amount of money which Aria caused any person to lose, but it is nonetheless the correct guidelines calculation. *See United States v. Beras*, 183 F.3d 22, 27 (1st Cir. 1999) (despite the reference to "loss" in the guideline providing the monetary table, the table still applies when expressly referenced in another guideline even where the is no actual loss).

Nevertheless, the fact that the monetary value here does not represent money that some person lost is a factor the Court should consider in granting a variance. The total value of the

funds which passed through Aria's bitcoin accounts does not equate to the loss suffered by any other person, at least not that Aria knowingly caused. And it certainly does not represent unjust enrichment to Aria. The volume of transactions is relevant to some degree, but it should not be be treated the same as money obtained by fraud or damages knowingly caused. As explained above, the evidence simply does not support such a finding in this case and to punish Aria as if she caused a $3.1 million loss, or as if she unjustly obtained such a large benefit, would be unfair.

The Court Should Also Grant a Variance Because of Aria's Personal History and Characteristics.

The Court has Aria's personal history and characteristics from three sources: the PSIR, a report from Dr. Laurie Guidry, Exhibit A (filed under seal at Level I), and character letters from people who know Aria well, Exhibits B - J.

*The PSIR and Dr. Guidry's Report.*

Most people involved in the criminal justice system, as well as most social scientists,[1] recognize that adverse childhood experiences increase the risk of an adult having mental health issues, of being a victim of crime, and of perpetrating a crime. Evidence of such abuse is mitigating and should be considered during sentencing for the obvious reason that a young child bears no responsibility for her own abuse or neglect.  As detailed in the PSIR and Dr. Guidry's report, Aria experienced many impactful adverse childhood experiences.

---

[1] *See, e.g.*, Reavis, "Adverse Childhood Experiences and Adult Criminality: How Long Must We Live before We Possess Our Own Lives?" Perm J. 2013 Spring; 17(2): 44–48; Wolf and Shi, "Childhood and Adult Trauma Experiences of Incarcerated Persons and Their Relationship to Adult Behavioral Health Problems and Treatment." Int J Environ Res Public Health. 2012 May; 9(5): 1908–1926; *see generally* Centers for Disease Control, Adverse Childhood Experiences (ACES) at https://www.cdc.gov/violenceprevention/aces/index.html

Aria was born as James Baker in Tupelo, Mississippi. Her parents were both drug addicts who could not hold a job. She experienced poverty, drug abuse, and chronic instability of her home as a very young child. Not surprisingly, her parents separated when she was six years old.

The separation brought some stability to Aria's life because she was eventually placed with her paternal grandmother. Her grandmother worked and had a relatively safe home. Aria's parents were supposed to have visitation, but they often did not exercise it, or when they did, it did more harm than good. Regarding her father, his visitation with Aria was inconsistent because "he couldn't keep from getting high and spending money on drugs." Exhibit A, at 5. Regarding her mother, she mostly did not show up, with one notable exception. On one occasion Aria's mother effectively kidnapped her and took her to Arkansas. Aria describes this as the worst time of her life. *Id*. at 6. At that time her mother was a "a crackhead on 'disability for migraines'" *Id*. at 5, who had a series of violent boyfriends, including one who would hold Aria over a well and threaten to drop her. Aria witnessed her mother being beaten and choked by her boyfriends. *Id*. at 5-6.

Eventually, Aria's father and paternal grandmother were able to bring Aria and her sister back to Mississippi to the grandmother's home where Aria remained until her early teens. During this time, Aria learned that her mother was missing. There were suspicions that she was murdered but no body was ever found, and no one was ever charged.

As Aria reached adolescence, she began to experience the feelings that eventually led to her becoming a transwoman. However, her grandmother wouldn't "have this behavior in her home" and threatened to "send Aria to a foster home." This situation eventually led to Aria moving out of her grandmother's home and to her father's apartment. There she had a few years which she called the "most normal" in her life. *Id*. at 7. She did have a minor criminal charge as

a juvenile which did not result in an adjudication, PSIR ¶65, but otherwise she did well, working and eventually attending college.

As James Baker, Aria was married in Mississippi. Although she cared for her wife, Aria's struggle with her gender and identity made the marriage difficult. Eventually, the marriage ended, and Aria left Mississippi because she did not feel she would ever be accepted as a transwoman there. Aria ultimately followed a mentor to New Hampshire where she met Ian Freeman, among others.

After multiple interviews and testing of Aria, Dr. Guidry reached important conclusions. She found that Aria has "a significant history of developmental trauma that persisted over the course of her childhood and youth." Exhibit A, at 13. Moreover, Aria currently "meets the DSM-V-TR diagnostic criteria for Major Depressive Disorder and Post-Traumatic Stress Disorder." *Id*.

Significantly for this case and Aria's involvement with Ian Freeman, Dr. Guidry found that:

> For Ms. DiMezzo, given her early chaotic developmental course, her capacity to accurately gauge who to trust and who to doubt is markedly skewed and exhibits a pattern of placing her trust in the wrong people, and mistrusting, at times, those whom she could potentially count on.

Id. at 13.

Finally, Dr. Guidry found that Aria "does not represent a significant risk for criminal re-offense at this time," but that Aria would benefit from a "supportive therapeutic alliance" to address her variety of psychological issues. *Id*.

In considering Aria's personal history and characteristics, the Court should recognize that Aria's history of trauma and her resulting diagnoses are mitigating. As stated by the Supreme Court, impaired mental functioning is "inherently mitigating," *see Tennard v. Dretke*, 542 U.S. 274, 285-88 (2004). Mental health conditions are so significant in the sentencing context that in

death penalty cases consideration of mitigating mental health evidence is constitutionally required. *See Payne v. Tennessee*, 501 U.S. 808, 822 (1991). For the same reason, an attorney's failure to investigate and present mitigating mental health evidence constitutes ineffective assistance of counsel. *See Porter v. McCollum*, 130 S. Ct. 447 (2009) (relating to the defendant's post-traumatic stress disorder stemming from his military service in Korea).

Of course, Aria is a competent adult and her mental health struggles do not excuse her conduct. But the question is not whether she should be convicted or whether she should be punished. The defense agrees that the answer to both questions is "yes." At the same time, it would be wrong, not to mention a violation of 18 U.S.C. 3553, to judge her without considering her personal history and characteristics, including her mental health.

*Criminal Conduct is Out of Character for Aria.*

One way to look at this case is to consider Aria's conduct when she is not under the influence of Ian Freeman or others in whom she should not have placed so much trust. The defense has filed nine character letters as Exhibits B – J. These letters reveal Aria to be a valued employee and generous friend.

One letter is from Andrea Madison. Andrea is the manager at Domino's Pizza in Keene. Aria has worked for Andrea since 2018. Some of the highpoints of Andrea's letter in support of Aria include the following:

> Aria is my most reliable employee on staff. She does not miss shifts. She is always willing to cover a shift if someone calls out…. I can always count on Aria to stay late or arrive early to help with prep, cleanup or do anything that helps with the function of an extremely busy restaurant. Aria works the production line longer, faster and more accurate than any person I have met. She is on her feet working all of the 8-12 hours that are required of her shifts. Aria does the work of at least 2 people every minute of her shift…. Aria is the type of leader that leads by example. She has done every possible task in the store while encouraging her teammates to do the same. She is a boss, not bossy. She has the respect of her team because of her servant leadership. Aria constantly models the behavior that we expect of our Domino's team members.

Exhibit B. Considering these comments, it is no surprise that Andrea attended Aria's change of plea hearing to provide support and is hopeful that Aria will be able to continue to work at her job.

Other letters are from unique perspectives, but they all attest to Aria's character. Zephan Wood, a law student, writes that despite his differences from Aria, when he was lonely and unable to make friends with others, Aria became his friend. Exhibit D. Shannon Summers writes:

> She's reliable and always willing to go out of her way to help out others, expecting nothing in return. She would give the shirt off her back to not only help her friends, but to anyone who needs help. I have witnessed Aria offer her home up to acquaintances when they had nowhere else to go. I have also seen her help a friend out when he was in need of a job.

Exhibit E. Matthew Santonastaso writes that he was "not really interested in becoming friends with a trans person." As an Army veteran and conservative, he did not think he would have much to say to Aria. Yet, after meeting her at a debate, they came to know each other and to his surprise she became a supportive friend. As he writes, "Just recently I had a moment of terrible depression. Aria, who I don't talk to that often, communicated with me on the phone and helped me through it in a very meaningful way." Exhibit J.

Aria is 36 years old with zero criminal history points for a reason. She is a good person. Her friends and coworkers trust her. They rely on her. They value her. She is not the scammer enriching herself at the expense of the elderly as the government insinuates. She is the lower middle class assistant manager from Domino's who is loved and valued by her friends. And she is that despite a history of childhood trauma that no one should have to endure.

<u>Conclusion: A Sentence of Home Confinement and Supervised Release is the Right Sentence in this Case.</u>

The defense recognizes that 18 U.S.C. 3553 requires the Court to impose a sentence which reflects the seriousness of the offense, promotes respect for the law, provides just punishment, deters other would-be criminals, and protects the public. In other words, the Court must give a sufficiently harsh sentence to send a message to everyone – Aria and the public at large – that her crime is serious and will be punished with serious consequences which will deter such conduct in the future. However, the statute also requires that the punishment be sufficient, but not greater than necessary, to achieve those purposes.

The goals of sentencing can be achieved without incarcerating Aria. There is little risk that she will commit any crime in the future. She has no criminal history and she has been of nearly perfect behavior during two years of pretrial release. Moreover, her vulnerability to being influenced by others to commit this crime is patent from the facts and from Dr. Guidry's report. There is every reason to believe that if Aria had not met Ian Freeman, she would not be in this situation. That is not to deny responsibility for her conduct, but only to acknowledge that this was a circumstance that occurred once in her life and is not likely to repeat itself.

A punishment of three years of supervised release with the first of those years on home confinement, allowing for employment, will be a greater punishment than that imposed on the other three defendants who pleaded guilty (and who admitted to actual fraud). It will send a strong message that even regulatory crimes have serious consequences. At the same time, that non-incarcerative sentence will avoid destroying Aria's life. It will accomplish the goals of sentencing without sending a transwoman suffering from PTSD as a result of childhood trauma into the Bureau of Prisons.

WHEREFORE the defense respectfully asks the Court to:

A.  Grant a variance from the guideline sentence;

B.  Impose a sentence of time served with three years of supervised release, including a special condition of one year of home confinement;

C.  In the alternative that any sentence of incarceration is imposed, permit Ms. DiMezzo to self-report to the facility designated by the Bureau of Prisons, with conditions of release to remain as they are now until she self-reports; and

D.  In the alternative that any sentence of incarceration is imposed, recommend to the Bureau of Prisons that she be incarcerated as near as possible to Keene, New Hampshire.

Date: April 17, 2023.

Respectfully submitted by counsel for Aria DiMezzo

*/s/ Richard Guerriero*
Richard Guerriero, Esq.
N.H. Bar ID. 10530 Lothstein Guerriero, PLLC Chamberlain Block Building39 Central Square, Suite 202Keene, NH 03431
Telephone: (603) 352-5000
richard@nhdefender.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the nonregistered participants on the date the document was signed by me.

_

*/s/ Richard Guerriero*
Richard Guerriero, Esq.

17